# NATIONAL LABOR RELATIONS BOARD v. BOEING CO. ET AL.

No. 71–1607.   Argued March 26, 1973—Decided May 21, 1973

REHNQUIST, J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, MARSHALL, and POWELL, JJ., joined. BURGER, C. J., filed a dissenting opinion, *post,* p. 78. DOUGLAS, J., filed a dissenting opinion, in which BURGER, C. J., and BLACKMUN, J., joined, *post,* p. 79.

*Norton J. Come* argued the cause for petitioner.   With him on the brief were *Solicitor General Griswold, Peter G. Nash,* and *Patrick Hardin.*

*Samuel Lang* argued the cause for respondent Boeing Co.   With him on the brief were *C. Dale Stout* and *Frederick A. Kullman.   Bernard Dunau* argued the cause for respondent Booster Lodge No. 405, International Association of Machinists & Aerospace Workers, AFL–CIO.   With him on the briefs were *Plato E. Papps, Louis P. Poulton,* and *C. Paul Barker.**

---

*\*J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

*Milton Smith, Gerard C. Smetana,* and *Jerry Kronenberg* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging affirmance.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

The question presented in this case is whether the National Labor Relations Board is required by § 8 (b) (1)(A) of the National Labor Relations Act [1] to inquire into the reasonableness of a disciplinary fine imposed by a union upon a member when the Board exercises its admitted authority under that section to determine whether the fine otherwise constitutes an unfair labor practice. The Board held that the validity of union fines under the Act does not depend on their being reasonable in amount. *Booster Lodge No. 405,* 185 N. L. R. B. 380, 383 n. 16, 75 L. R. R. M. 1004, 1007 n. 16 (1970). On petition for judicial review of this determination, the Court of Appeals held that an unreasonably large fine is coercive and restraining within the meaning of § 8 (b)(1) (A), and remanded the case to the Board with directions to consider "questions relating to the reasonableness of the fines imposed by the Union." *Booster Lodge No. 405, International Association of Machinists* v. *NLRB,* 148 U. S. App. D. C. 119, 137, 459 F. 2d 1143, 1161 (1972). We granted certiorari, 409 U. S. 1074 (1972), and now reverse the judgment below.

From May 16, 1963, through September 15, 1965, Booster Lodge No. 405, International Association of Machinists & Aerospace Workers, AFL–CIO (the Union), and the Boeing Co. (the Company) were parties to a collective-bargaining agreement. Upon expiration of this agreement the Union called a lawful economic strike at the Company's

---

[1] "(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . . ." 61 Stat. 141, 29 U. S. C. § 158 (b)(1)(A).

Michoud plant in New Orleans and at other locations. As of October 2, 1965, the parties signed a new collective-bargaining agreement and the strikers thereafter returned to work. Both agreements contained maintenance-of-membership clauses that required Union members to retain their membership during the contract term. New employees were required to notify the Union and the Company within 40 days of accepting employment if they elected not to join the Union.

During the 18-day strike some 143 employees out of 1,900 production and maintenance employees in the bargaining unit at the Michoud plant crossed the picket lines and returned to work. All of these employees were Union members at the time the strike began, although some of them tendered their resignations either before or after crossing the picket lines.[2] In late October or early November 1965 the Union notified these employees that charges had been preferred against them for violating the International Union's constitution. The constitution provides penalties for the "improper conduct of a member," which term includes "[a]ccepting employment . . . in an establishment where a strike . . . exists." In accordance with appropriate union procedures, including notice and opportunity for a hearing, all strikebreakers were found guilty, fined $450, and barred from holding Union office for a period of five years.[3] While

---

[2] Of the 143 employees who crossed the picket lines, 24 made no attempt to resign from the Union, 61 resigned before crossing the picket lines, and 58 resigned after crossing the picket lines and reporting for work. The validity of the fines imposed against those who resigned from the Union is considered in a companion case, *Machinists & Aerospace Workers* v. *NLRB, post,* p. 84. See also *NLRB* v. *Textile Workers,* 409 U. S. 213 (1972).

[3] The Union constitution provides that members found guilty of misconduct after notice and a hearing are subject to "reprimand, fine, suspension, or expulsion from membership or any lesser penalty

some of the fines were reduced and some partial payments were received by the Union, no member paid the full $450.[4] After warning members to pay their fines or face the consequences, the Union filed suits in state court against nine individual employees to collect the fines. None of these suits has been finally adjudicated.

In February 1966 the Company filed a charge with the Labor Board alleging that the attempted court enforcement of the fines violated § 8 (b)(1)(A) of the National Labor Relations Act. The allegations were basically twofold: first, that the Union committed an unfair labor practice by fining employees who had resigned from the Union, an issue that we consider in the companion case, *Machinists & Aerospace Workers* v. *NLRB, post,* p. 84; and, second, that as to the members who were otherwise validly fined, the fines were unreasonable in amount. Thereafter the Board's General Counsel issued a complaint and the case was heard by a Trial Examiner. With respect to the second issue, the Trial Examiner determined that the fines were impermissibly excessive, but the Board refused to adopt his conclusion. It relied on a case decided the same day, *Machinists, Local Lodge 504 (Arrow Development Co.),* 185 N. L. R. B. 365, 75 L. R. R. M. 1008 (1970), reversed *sub nom. O'Reilly* v. *NLRB,* 472 F. 2d 426 (CA9 1972), in which it held that Congress did not intend to give the Board authority to regulate the size of union fines or to establish standards with respect to a fine's reasonableness.

---

or combination." The constitution sets no maximum dollar limitation on fines.

[4] The base income of the employees fined ranges from $95 to $145 for a 40-hour workweek.

Fines were reduced to 50% of wages earned during the strike for 35 members who appeared for the Union trial, apologized for their actions, and pledged loyalty to the Union. Eighteen of these reduced fines have been paid in full.

Section 8 (b)(1)(A) of the Act provides, in pertinent part, that it shall be an unfair labor practice for a labor organization "to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 of this title." [5] Among the § 7 rights guaranteed to employees is the right to refrain from any of the concerted activities described in that section.[6] We have previously held that § 8 (b)(1)(A) was not intended to give the Board power to regulate internal union affairs, including the imposition of disciplinary fines, with their consequent court enforcement, against members who violate the unions' constitutions and bylaws. *NLRB* v. *Allis-Chalmers Mfg. Co.,* 388 U. S. 175 (1967); *Scofield* v. *NLRB,* 394

[5] The proviso to this section states: "That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." It has been the Board's position that this proviso authorizes the unions to impose disciplinary fines on union members. *Minneapolis Star & Tribune Co.,* 109 N. L. R. B. 727, 34 L. R. R. M. 1431 (1954); *Wisconsin Motor Corp.,* 145 N. L. R. B. 1097, 55 L. R. R. M. 1085 (1964); *Allis-Chalmers Mfg. Co.,* 149 N. L. R. B. 67, 57 L. R. R. M. 1242 (1964). This Court, however, in holding that court enforcement of union fines was not an unfair labor practice in *NLRB* v. *Allis-Chalmers Mfg. Co.,* 388 U. S. 175 (1967), relied on congressional intent only with respect to the first part of this section. The parties' principal contentions in this case do not depend on the scope of the proviso and we do not consider its interpretation necessary to our conclusion.

[6] In its entirety § 7 provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a) (3)." 61 Stat. 140, 29 U. S. C. § 157.

U. S. 423 (1969). In *Allis-Chalmers* we held that court enforcement of fines ranging from $20 to $100 for crossing picket lines did not "restrain or coerce" employees within the meaning of the Act. And in *Scofield* we held that the union did not violate the Act in imposing fines of $50 and $100 on members for violating a union rule relating to production ceilings.

In deciding these cases, the Court several times referred to the unions' imposition of "reasonable" fines. In particular, the *Scofield* Court concluded "that the union rule is valid and that its enforcement by *reasonable* fines does not constitute the restraint or coercion proscribed by § 8 (b)(1)(A)." 394 U. S., at 436 (emphasis added). The Company contends, not illogically, that the Court's use of the adjective "reasonable" was intended to suggest to the Board that an unreasonable fine would amount to an unfair labor practice.

This interpretation, however, permissible as it may be, is only dicta, since in both *Allis-Chalmers* and in *Scofield* the reasonableness of the fines was assumed. 388 U. S., at 192–193, n. 30; 394 U. S., at 430.[7] Being squarely presented with the issue in this case, we recede from the implications of the dicta in these earlier cases. While

---

[7] Moreover, since the Board has consistently over a long period of time interpreted the Act as not giving it authority to examine the reasonableness of disciplinary fines, *infra*, at 74–75, it is not likely that the Court specifically intended, by the use of a single adjective, and without mentioning the Labor Board cases to the contrary, to overturn the Board's interpretation of the Act. Nor can it be argued that the Court was unaware of the Board's interpretation, for the *Scofield* Court stated that in *Allis-Chalmers* it

"essentially accepted the position of the National Labor Relations Board dating from *Minneapolis Star & Tribune Co.*, 109 N. L. R. B. 727 (1954) where the Board also distinguished internal from external enforcement in holding that a union could fine a member for his failure to take part in picketing during a strike . . . ." *Scofield* v. *NLRB*, 394 U. S. 423, 428 (1969).

"unreasonable" fines may be more coercive than "reasonable" fines, all fines are coercive to a greater or lesser degree. The underlying basis for the holdings of *Allis-Chalmers* and *Scofield* was not that reasonable fines were noncoercive under the language of § 8 (b)(1)(A) of the Act, but was instead that those provisions were not intended by Congress to apply to the imposition by the union of fines not affecting the employer-employee relationship and not otherwise prohibited by the Act. The reason for this determination, in turn, was that Congress had not intended by enacting this section to regulate the internal affairs of unions to the extent that would be required in order to base unfair labor practice charges on the levying of such fines.

The Court's examination of the legislative history of this provision in *Allis-Chalmers* led to the conclusion that:

> "What legislative materials there are dealing with § 8 (b)(1)(A) contain not a single word referring to the application of its prohibitions to traditional internal union discipline in general, or disciplinary fines in particular. On the contrary there are a number of assurances by its sponsors that *the section was not meant to regulate the internal affairs of unions.*" 388 U. S., at 185–186 (emphasis added).[8]

In *Scofield* we decided that Congress intended to distinguish between the external and the internal enforcement of union rules, and that therefore the Board would

---

[8] As we also noted in *Allis-Chalmers*, this interpretation is supported by the Landrum-Griffin Act, where "Congress expressly recognized that a union member may be 'fined, suspended, expelled, or otherwise disciplined,' and enacted only procedural requirements to be observed. 73 Stat. 523, 29 U. S. C. § 411 (a)(5)." *NLRB* v. *Allis-Chalmers Mfg. Co.*, 388 U. S., at 194.

have authority to pass on those rules affecting an individual's employment status but not on his union membership status. 394 U. S., at 428–430.

Inquiry by the Board into the multiplicity of factors that the parties and the Court of Appeals correctly thought to have a bearing on the issue of reasonableness would necessarily lead the Board to a substantial involvement in strictly internal union affairs. While the line may not always be clear between those matters that are internal and those that are external, to the extent that the Board was required to examine into such questions as a union's motivation for imposing a fine it would be delving into internal union affairs in a manner which we have previously held Congress did not intend.[9] Given the rationale of *Allis-Chalmers* and *Scofield,* the Board's conclusion that § 8 (b) (1) (A) of the Act has nothing to say about union fines of this nature, whatever their size, is correct. Issues as to the reasonableness or unreasonableness of such fines must be decided upon the basis of the law of contracts, voluntary associations, or such other principles of law as may be applied in a forum competent to adjudicate the issue. Under our holding, state courts will be wholly free to apply state law to such issues at the suit of either the union or the member fined.

Our conclusion is also supported by the Board's longstanding administrative construction to the same effect. At least since 1954, it has been the Board's consistent position that it has "not been empowered by Congress . . . to pass judgment on the penalties a union may impose on a member so long as the penalty does not

---

[9] Cf. *Motor Coach Employees* v. *Lockridge,* 403 U. S. 274, 296 (1971); *U. O. P. Norplex* v. *NLRB,* 445 F. 2d 155, 158 (CA7 1971) ("The reasonableness of the fines is a matter for the state court to determine should the Union seek judicial enforcement of the fines").

impair the member's status as an employee." *Local 283, UAW,* 145 N. L. R. B. 1097, 1104 (1964). See also *Minneapolis Star & Tribune Co.,* 109 N. L. R. B. 727, 34 L. R. R. M. 1431 (1954). We have held in analogous situations that such a consistent and contemporaneous construction of a statute by the agency charged with its enforcement is entitled to great deference by the courts. *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 433–434 (1971); *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965).[10]

The Court of Appeals and the Company have suggested several policy reasons why the Board should not leave the determinations of reasonableness entirely to the state courts. Their basic reasons are, first, that more uniformity in the determination of what is reasonable will result if the Board suggests standards and, second, that more expertise in labor matters will be brought to bear if the issue is decided by the Board rather than solely by the courts. Even if we were to concede the relevance of policy factors in determining congressional intent, we are not persuaded that the Board is necessarily the better forum for determining the reasonableness of a fine.

As we noted in *Allis-Chalmers,* court enforcement of union fines is not a recent innovation but has been known at least since 1867. 388 U. S., at 182 n. 9. See also Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L. J. 175 (1960). The relationship between a member and his union is generally viewed as contractual in nature, *International Association of Machinists* v. *Gonzales,* 356 U. S. 617, 618 (1958); *Scofield* v. *NLRB,* 394 U. S., at 426 n. 3; *NLRB* v. *Textile Workers,* 409 U. S. 213, 217 (1972), and the

---

[10] It is also noteworthy that when Congress has intended the Board to examine a fee for being excessive or unreasonable, it has specifically so stated and has provided statutory standards for the Board to follow in making such a determination. See, *e. g.,* 29 U. S. C. § 158 (b)(5) (union initiation fees).

local law of contracts or voluntary associations usually governs the enforcement of this relationship. *NLRB v. Allis-Chalmers Mfg. Co.,* 388 U. S., at 182 and 193 n. 32; *Scofield* v. *NLRB, supra,* at 426 n. 3.

We alluded to state court enforcement of unusually harsh union discipline in *Allis-Chalmers* when we stated that "state courts, in reviewing the imposition of union discipline, find ways to strike down 'discipline [which] involves a severe hardship.'" 388 U. S., at 193 n. 32, quoting Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049, 1078 (1951). The Board assumed that in view of this statement, our reference to "reasonable" fines, when reasonableness was not in issue, in *Allis-Chalmers* and in *Scofield,* was merely adverting to the usual standard applied by state courts in deciding whether to enforce union-imposed fines. The Board reads these cases, therefore, as encouraging state courts to use a reasonableness standard, not as a directive to the Board.[11]

Our review of state court cases decided both before and after our decisions in *Allis-Chalmers* and *Scofield* reveals that state courts applying state law are quite willing to determine whether disciplinary fines are reasonable in amount.[12] Indeed, the expertise required for a deter-

---

[11] The Board's interpretation of our decisions is basically the following:

"Thus, the Court's findings that the fines in those cases were reasonable seems directed to enforcing courts, encouraging those courts to make an independent determination of the reasonableness of the fine in each case presented, in the same fashion as courts limit other union discipline which imposes a severe hardship. Such considerations are of an equitable nature rather than of the character of restraint and coercion with which the National Labor Relations Act treats." *Machinists, Local Lodge 504 (Arrow Development Co.),* 185 N. L. R. B. 365, 368, 75 L. R. R. M. 1008, 1010 (1970).

[12] *Auto Workers Local 283* v. *Scofield,* 76 L. R. R. M. 2433 (Wis. Sup. Ct. 1971) ($100 fine deemed reasonable); *Farnum* v.

mination of reasonableness may well be more evident in a judicial forum that is called upon to assess reasonableness in varying factual contexts than it is in a specialized agency. In assessing the reasonableness of disciplinary fines, for example, state courts are often able to draw on their experience in areas of the law apart from labor relations.[13]

Nor is it clear, as contended by the Court of Appeals, that the Board's setting of standards of reasonableness will necessarily result in greater uniformity in this area even if uniformity is thought to be a desirable goal. Since state courts will have jurisdiction to determine reasonableness in the enforcement context in any event, the Board's independent determination of reasonableness in an unfair labor practice context might well yield a

---

*Kurtz,* 70 L. R. R. M. 2035 (Los Angeles Mun. Ct. 1968) ($592 fine deemed unreasonable and reduced to $100); *McCauley* v. *Federation of Musicians,* 26 L. R. R. M. 2304 (Pa. Ct. of Common Pleas 1950) ($300 fine deemed excessive and reduced to $100); *North Jersey Newspaper Guild Local No. 173* v. *Rakos,* 110 N. J. Super. 77, 264 A. 2d 453 (1970) ($750 fine reduced to $500, which was deemed reasonable); *Walsh* v. *Communications Workers of America, Local 2336,* 259 Md. 608, 271 A. 2d 148 (1970) ($500 fine deemed reasonable); *Local 248, United Auto Workers* v. *Natzke,* 36 Wis. 2d 237, 153 N. W. 2d 602 (1967) ($100 fine upheld); *Jost* v. *Communications Workers of America, Local 9408,* 13 Cal. App. 3d Supp. 7, 91 Cal. Rptr. 722 (1970) ($299 fine upheld, the court stating that "it is the settled law in this country that such a fine becomes a debt enforceable by the courts in an amount that is not unreasonably large." *Id.,* at 12, 91 Cal. Rptr., at 725).

[13] See, *e. g., Farnum* v. *Kurtz, supra,* at 2041, where a municipal court judge, in reducing a union-imposed fine of $592 to $100, revealed that the kind of expertise required by this type of case is not that of a technical knowledge of labor law:

"Based upon the facts herein and the Court's experiences [in passing judgment in thousands of misdemeanor cases], the fine assessed is much too large and unreasonable. The Court finds that a fine of $100.00 serves the ends of justice and is more in keeping with the circumstances herein and reasonable."

conflict when the two forums are called upon to review the same fine.

For all of the foregoing reasons, we conclude that the Board was warranted in determining that when the union discipline does not interfere with the employee-employer relationship or otherwise violate a policy of the National Labor Relations Act,[14] the Congress did not authorize it "to evaluate the fairness of union discipline meted out to protect a legitimate union interest."[15] The judgment of the Court of Appeals is, therefore,

*Reversed.*

MR. CHIEF JUSTICE BURGER, dissenting.

It is odd, to say the least, to find a union urging on us severe limitations on NLRB authority, and telling us that state courts are the proper forum to resolve questions regarding the reasonableness of fines imposed on workers for violation of union rules. For years, there has been unrelenting union opposition to state court "intervention" into industrial disputes and union activities. We have been told countless times that the "expertise" of the Labor Board, based on its overview and intimate familiarity with labor problems, is essential in this area.

A union must, of course, have some disciplinary powers or it would disintegrate. However, the power to discipline can easily turn from a means of enforcing valid

---

[14] *Scofield* v. *NLRB*, 394 U. S., at 429; *NLRB* v. *Marine Workers*, 391 U. S. 418 (1968).

[15] *Machinists, Local Lodge 504 (Arrow Development Co.)*, 185 N. L. R. B. 365, 638, 75 L. R. R. M. 1008, 1011 (1970). The Board has long held that the Act proscribes certain unacceptable methods of union coercion, such as physical violence to force an employee to join a union or to participate in a strike. *In re Maritime Union*, 78 N. L. R. B. 971, enforced, 175 F. 2d 686 (CA2 1949), cited in *Scofield* v. *NLRB, supra*, at 428 n. 4.

rules to an oppressive and coercive device of retribution, a weapon which, when used to extremes, may deprive a working man of his very means of sustenance. Whether a particular fine is required in a particular situation involves a weighing of the delicate balance of relations between the employers, employees, and the union involved. Such an intimate knowledge of labor relations has consistently been ascribed to the Board, often by the unions. It is the Board that deals with such matters on a daily basis. It is the Board that has the jurisdiction and experience to devise and employ national standards to govern union conduct; there are valid reasons for essential uniformity and consistency in the matters of fines. To isolate this sensitive subject and thrust it on the state courts is contrary to the entire history of the federal labor statutes and opens the door to a wide disparity of fines for the same conduct in different States.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN concur, dissenting.

I dissent from the holding of the Court that the Board has no jurisdiction to determine the "reasonableness" of the fines placed by the Union on its dissident members.

The Union and Boeing had an effective collective-bargaining agreement from May 16, 1963 through September 15, 1965. On the expiration of that contract the Union struck against Boeing, causing a work stoppage that lasted 18 days. On October 2, 1965, a new collective agreement was reached and work was resumed.

During the strike, about 143 employees at the Michoud plant crossed the picket line and reported for work. All of these had been Union members during the 1963–1965 contract period. Some of the 143 who worked during the strike did not resign from the Union; 119 did resign—61 before they crossed the picket line and re-

turned to work; 58 resigned during the course of the strike, but after they had crossed the picket line. All of these resignations were submitted after the expiration of the 1963–1965 collective agreement. The Union never warned members on this or on earlier occasions, that disciplinary measures could or would be taken against members who crossed the picket line.

After the new collective agreement was reached, the Union notified all members who had crossed the picket line to work during the strike that charges had been laid against them and that they would be tried by the Union for "improper" conduct, the Union's constitution permitting disciplinary measures, including "reprimand, fine, suspension and/or expulsion from membership, or any lesser penalty or any combination."

Those who appeared for trial and those who did not appear were found guilty and fined $450 each and barred from holding a Union office for five years. The fines of some 35 who appeared and apologized and took a loyalty oath were reduced to 50% of their earnings during the strike; and the prohibition against holding Union office was reduced in those cases.

The Union sent out a written notice saying that the unpaid fines had been referred to an attorney for collection and that the reduced fines would be restored to $450 if not paid. Suits against nine employees were filed in a state court to collect the fines plus attorneys' fees and interest; and they are unresolved.

Boeing filed a charge of an unfair labor practice against the Union under § 8 (b)(1)(A) of the Act.* The Gen-

---

*That section provides:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules

eral Counsel issued a complaint and the Board decided that the Union had violated § 8 (b)(1)(A) except for the fines on members for crossing the picket line to work and for the fines on those who resigned after returning to work during the strike, for work performed during the strike prior to their resignations. But the Board, one member dissenting, refused to pass on the reasonableness of the fines, holding it lacked the power to do so.

The unfair labor practice under § 8 (b)(1)(A) is the action of a union "to restrain or coerce" an employee from the "right to refrain from" assisting a union as that right is defined in § 7. In *Scofield* v. *NLRB*, 394 U. S. 423, we upheld a union rule and concluded "that its enforcement by *reasonable* fines does not constitute the restraint or coercion proscribed by § 8 (b)(1)(A)." *Id.,* at 436 (emphasis added). See also *NLRB* v. *Allis-Chalmers Mfg. Co.,* 388 U. S. 175. The imposition of a nominal fine of $1 might suit the circumstances of a case, where a $1,000 fine would be monstrous. A nominal fine might be justified where, as here, the employees had no warning that they would or could be fined for working behind a picket line. A fine where the only sanction would be temporary suspension from the union might be "reasonable," yet unreasonable if it was court enforceable, meaning, as it does here, that attorneys' fees, costs,

---

with respect to the acquisition or retention of membership therein." 61 Stat. 141, 29 U. S. C. § 158 (b)(1)(A).

Section 7 provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a)(3)." 29 U. S. C. § 157.

and interest may be added. A member who must pay the union's attorney as well as his own if he challenges the reasonableness of a fine in a state court and loses, may well be suffering an unconscionable penalty. Moreover, the fine may be imposed by a union which believed as did the present Union that the member had no "right" to resign, though *NLRB* v. *Textile Workers*, 409 U. S. 213, held to the contrary. The present fines seem to be swollen by that predilection of the Union. The present fines also exceed the earnings of the workers during the strike period. By what standard can that possibly be justified? As member McCulloch of the Board, dissenting, said, the excess of the fines over the wages collected during this period is in actual effect an assessment after the strike is over. If after the strike the Union caused Boeing to suspend a member without pay after the strike because he had worked during the strike, there could be no question but that the Union violated § 8 (b)(1)(A). Yet, the assessment of fines greater than the wages earned during the strike has precisely that effect. Thus, in assessing an unreasonable fine the Union, in my view, goes beyond the permissible bounds of regulating its internal affairs.

It is no answer to say that the reasonableness of a fine may be tested in a state-court suit. That envisages a rich and powerful union suing a rich and powerful employee. Employees, however, are often at the bottom of the totem pole, without financial resources, and unworldly when it comes to litigation. Such a suit is likely to be no contest. The Board procedures, on the other hand, may be readily available. If an employee files a charge with any merit, the Regional Director will issue a complaint. Thereafter, the General Counsel represents the employee, and the agency bears any cost of prosecuting the claim.

But my difficulty with the Court's decision is even greater. State judges, though honest and competent, have no expertise in labor-management relations. The Board does have that expertise and can evolve guidelines based on its broad experience. It is said that Congress has provided the Board with no guidelines for passing on the "reasonableness" of union-imposed fines. But the Board through case-by-case treatment has been developing an administrative common law concerning "unfair" practices of employers and unions alike. We have said on other occasions that the "experience and commonsense" which are facets of the expertise of the Board, *NLRB* v. *Radio & Television Broadcast Engineers*, 364 U. S. 573, 582–583, are adequate for the difficult and delicate responsibilities which Congress has entrusted to it, subject of course to judicial review. A fine discretely related to a legitimate union need and reflecting principled motivations under the law is one thing. A fine that reflects the raw power exercised by a union in its hunger for all-pervasive authority over members is quite another problem. The Labor Board, which knows the nuances of this problem better than any other tribunal, is the keeper of the conscience under the Act. It and it alone has primary responsibility to police unions, as well as employers, in protection of the rights of workers. In my view it cannot properly perform its duties under § 8(b)(1)(A) unless it determines whether the nature and amount of the fine levied by a union constitute an unfair labor practice.