577 F.2d 1113
 47 A.L.R.Fed. 800, 6 O.S.H. Cas.(BNA) 1197,
1978 O.S.H.D. (CCH) P 22,588
 W. J. USERY, Jr., Secretary of Labor, Petitioner,
v.
KENNECOTT COPPER CORPORATION and the Occupational Safety and
Health Review Commission, Respondents.
 No. 76-1735.
 United States Court of Appeals,
Tenth Circuit.
 Submitted Nov. 14, 1977.
Decided Dec. 23, 1977.
 
 Dennis K. Kade, U. S. Dept. of Labor, Washington, D. C. (Alfred G. Albert, Benjamin W. Mintz and Allen H. Feldman, Washington, D. C., on the brief), for petitioner.
 James B. Lee, Salt Lake City (Kent W. Winterholler, Salt Lake City, on the brief), of Parsons, Behle & Latimer, Salt Lake City, Utah, for respondent Kennecott.
 Before SETH, HOLLOWAY and BARRETT, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 The Secretary of Labor (Secretary) petitions for review of an order of the Occupational Safety and Health Review Commission (Commission), which vacated an administrative law judge's decision that Kennecott Copper Company (Kennecott) had violated certain OSHA regulations. In reversing the decision of the administrative law judge, a divided Commission found that Kennecott had not failed to comply with occupational health and safety standards promulgated by the Secretary. Jurisdiction for review is derived from 29 U.S.C. § 660(b) of the Occupational Safety and Health Act (the Act), 29 U.S.C. § 651, et seq.
 
 
 2
 The facts are basically undisputed. Kennecott, a large mineral mining and processing concern, employs some 1200 persons at its Magna, Utah, smelting plant. In addition to smelting copper ore at its Magna plant, Kennecott captures the fumes produced in the smelting process and, by passing them through "mist treaters," produces sulphuric acid. The "mist treaters," which are large cylindrical vats, several stories high, encircled by protruding horizontal ribs, occasionally spring leaks. When such difficulties occur, skilled workmen, known as "leadburners," repair the leaks by standing on temporary scaffolds in order to reach the troublesome areas.
 
 
 3
 The citations issued against Kennecott grew out of an accident which occurred at the Magna plant in November of 1974. Nick Laboa, a highly skilled and experienced "leadburner," constructed a makeshift scaffold to reach a leak 10 to 11 feet above the ground. He took a six-foot long wooden plank with cleats in both ends and hooked it onto an angle-iron bracket attached to the inside of one of the "mist treaters." There were no guard rails or toeboards on this scaffold and he did not use a ladder in order to gain access to the scaffold. While either working on the scaffold or ascending to it, he fell.
 
 
 4
 After a routine investigation of the accident by a representative of the Secretary, Kennecott was cited for failing to comply with OSHA regulations relating to scaffolds:
 
 
 5
 He had not been furnished with a scaffold which was erected in accordance with the promulgated standards. The scaffold he used, which was approximately 11 feet 10 inches above the floor, was not provided with guardrails installed on the open side and across the two ends of the scaffold platform.
 
 
 6
 (R., Vol. III, p. 1.)
 
 
 7
 Further, Kennecott was cited for not providing a ladder for Laboa to use in gaining access to the scaffold:
 
 
 8
 In addition, the employee gained access to the scaffold by unsafe means in that a ladder or equivalent safe access had not been provided.
 
 
 9
 (R., Vol. III, p. 1.)
 
 
 10
 Kennecott filed notice of intent to contest the citations and proposed penalty. Following a hearing, the administrative law judge found that Kennecott had violated the Act by failing to comply with occupational safety and health standards. He fined Kennecott $350. The judge specifically found that standards requiring guardrails on scaffolds had been properly promulgated and that Kennecott should have required the use of access ladders when its employees were ascending to scaffolds.
 
 
 11
 Kennecott appealed to the Commission, which reversed the judge's decision. In exonerating Kennecott, the Commission ruled that Kennecott had not violated the regulation requiring the use of guardrails on scaffolds because the regulation had been improperly promulgated and was, therefore, not binding on Kennecott. The Commission also found that Kennecott had not violated the regulation dealing with providing access ladders.
 
 
 12
 In petitioning for review, the Secretary contends that: (1) the Commission erroneously declared that the regulation dealing with guardrails was unenforceable because of improper promulgation and (2) the Commission erred in concluding that Kennecott had satisfied its OSHA obligations by providing its employees scaffold access ladders without requiring their use.
 
 
 13
 The Act was passed in 1970 to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions."[1] To effect this objective the Secretary of Labor was empowered to promulgate mandatory occupational safety and health standards[2] which would be applicable to any "person engaged in a business affecting commerce who has employees."[3] In order to ensure that the Secretary would be able to swiftly promulgate safety and health standards, Congress empowered him to adopt existing industry standards for the first two years following enactment of the Act.[4] These standards, known as "national consensus standards," could be promulgated by the Secretary without any rulemaking procedures if they:
 
 
 14
 . . . had been adopted and promulgated by a nationally recognized standards-producing organization under procedures whereby it can be determined by the Secretary that persons interested and affected by the scope of provisions of the standard have reached substantial agreement on its adoption.[5]
 
 
 15
 After the two year period allowed for promulgation of these interim standards any new standards or modification or revocation of standards could be enacted only by following the formal rulemaking procedure outlined in the Act.
 
 I.
 
 16
 The first citation charged Kennecott with failing to comply with a standard mandating the use of guardrails and toeboards in scaffolds:
 
 
 17
 Guardrails and toeboards shall be installed on all open sides and ends of platforms more than 10 feet above the ground or floor. (Emphasis supplied.)
 
 
 18
 29 CFR 1910.28(a)(3).
 
 
 19
 This regulation was promulgated shortly after passage of the Act. Accordingly, the Secretary was not required to follow the Act's rulemaking procedures.
 
 
 20
 The Commission found that there had been no violation of this regulation by Kennecott because it had not been promulgated in accordance with the provisions of the Act and was, therefore, unenforceable. As noted above, the Secretary was granted broad powers to adopt necessary standards during the first two years of the Act's life so that safer working conditions would be provided American employees in a short time. In preparing the interim safety standards for scaffolds, the Secretary turned to standards which had been formulated by the American National Standards Institute (ANSI), which read:
 
 
 21
 Guardrails and toeboards should be installed on all open sides and ends of platforms more than 10 feet above the ground or floor. (Emphasis supplied.)
 
 
 22
 (American National Standard Safety Requirements for Scaffolding, American National Standards Institute, 1969, p. 9.)
 
 
 23
 In promulgating this standard the Secretary changed the language concerning guardrails on scaffolds so that it assumed a mandatory, rather than advisory, character:
 
 
 24
 Mandatory rules of this standard are characterized by the word shall. If a rule is of an advisory nature it is indicated by the word should or is stated as a recommendation. (Ibid, p. 7.)
 
 
 25
 It is the Secretary's adoption of the regulation by use of the word shall rather than the word should which poses the problem presented here. We must determine whether this usage constitutes such a substantial change that the regulation is not to be considered as a national consensus standard.
 
 
 26
 The Secretary contends that the change from should to shall is not significant, in that it is simply a pro forma change, having no substantive effect on the regulation. The Secretary points to the statute which requires an employer to follow health and safety standards promulgated by the Secretary:
 
 
 27
 Each employer shall comply with occupational safety and health standards promulgated under this chapter.
 
 
 28
 29 U.S.C. § 654(a)(2).
 
 
 29
 Because of the mandatory nature of the standards under the Act, the Secretary asserts that the substitution of mandatory for advisory language in the adoption of the guardrails and toeboards interim standards was valid. The Secretary argues that if the standards are to be complied with, it makes no difference whether the actual language is advisory or mandatory.
 
 
 30
 Employers are, of course, required to comply with standards properly established by the Secretary. The Act accords its special interim treatment exclusively to "any national consensus standard and any established Federal standard."[6] The usual procedural due process safeguards accorded to persons who might be adversely affected by government regulations were relaxed only to the extent that standards, which had already been scrutinized and recognized by those to be affected and upon which there existed substantial agreement, would be considered acceptable for adoption as "national consensus standards." If, however, standards which were to be adopted during the two year interim involved modifications of established standards, then a formalized procedure had to be followed. This procedure included: recommendations to the Secretary from an advisory committee, publication of a proposed rule in the Federal Register, allowance of time for comments from interested persons, and public hearing if objections are raised.[7] These procedures are designed to provide those who might be affected the opportunity to acquaint themselves with the proposed rule and to voice any possible opposition thereto. These procedural due process requisites have long been recognized as part of our system of jurisprudence.
 
 
 31
 We hold that the Secretary did not comply with the statute by reason of his failure to adopt the ANSI standard verbatim or by failure to follow the appropriate due process procedure. The promulgation of the standard with the use of shall rather than should did not constitute the adoption of a national consensus standard. It is, therefore, unenforceable. In order for the Secretary to have rendered the standard enforceable with the change in language, he was obliged to observe the rulemaking procedures contained in the Act. Administrative regulations are not absolute rules of law and should not be followed when they conflict with the design of the statute or exceed the administrative authority granted. National Labor Relations Board v. Boeing Co., 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973); Commissioner of Internal Revenue v. Acker, 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127 (1959); Reardon v. United States, 491 F.2d 822 (10th Cir. 1974).
 
 
 32
 The Commission, in a decision which posed the same issue as that before us here, articulated the view that only standards which are national consensus standards are valid. Secretary v. Oberhelman-Ritter Foundry, Inc., OSAHRC Docket No. 1572 (July 31, 1973).
 
 
 33
 Further, we observe that the Secretary has recognized that only mandatory standards should be seen as national consensus standards:
 
 
 34
 The national consensus standards contain only mandatory provisions of the standards promulgated by those two organizations. (ANSI and National Fire Protection Association.) The standards of ANSI and NFPA may also contain advisory provisions and recommendations the adoption of which by employers is encouraged, but they are not adopted in Part 1910.
 
 
 35
 Fed.Register 36 No. 165, p. 10466.
 
 
 36
 We hold that the Secretary improperly promulgated the standard dealing with mandatory guardrails. We affirm the decision of the Commission that Kennecott could not be held to be in violation of an unenforceable standard.
 
 II.
 
 37
 Kennecott was also charged with violating an OSHA standard which required that when workers were on scaffolds, "An access ladder or equivalent safe access shall be provided."[8] In holding that Kennecott had not violated this regulation, the Commission interpreted "provided" as being synonymous with "made available."
 
 
 38
 The Secretary contends that this interpretation is incorrect because it is in derogation of the underlying purpose of the Act. The Secretary maintains that the Commission erred in finding that Kennecott had complied with this regulation by simply providing its employees scaffold access ladders without requiring that they use them.
 
 
 39
 There is undisputed testimony that ladders were available to Kennecott's employees. It was also shown that some of the "leadburners" did not use them when ascending to their scaffolds and that Kennecott did not insist that such workers use the ladders for access to the scaffolds.
 
 
 40
 We hold that the Secretary's interpretation of the regulation is erroneous. Kennecott did comply with the regulation by providing ladders. It was not the purpose of the Act to make an employer the insurer of his employees' safety. Dunlop v. Rockwell, International, 540 F.2d 1283 (6th Cir. 1976); Brennan v. OSAHRC, 511 F.2d 1139 (9th Cir. 1975). The ultimate aim of the act was not to prevent all accidents, but to provide American employees with safe and healthful working conditions "so far as possible."[9] Certainly the Act requires employers to be diligent in protecting the health and safety of its employees; however, it does not hold the employer responsible for the prevention of all accidents. In addition, the act does impose some responsibility for their safety on the employees, for "Each employee shall comply with occupational safety and health standards."[10]
 
 
 41
 We do not agree that the Secretary may read "shall be provided" to mean "shall require use." In interpreting regulations, one must look at the plain meaning of the words used. The meaning usually attributed to the word provide is to furnish, supply or make available.[11]
 
 
 42
 If the Secretary had determined to require that employees use ladders, he could have done so only by complying with the rulemaking procedure outlined in the Act. He did not do so. Accordingly, Kennecott was not required to assume the burden of guessing what the Secretary intended plain and unambiguous words employed in the safety regulations to mean. This is especially true when violation of a regulation subjects one to criminal or civil sanctions. A regulation cannot be construed to mean what an agency intended but did not adequately express. United States v. Ray, 488 F.2d 15 (10th Cir. 1973); Diamond Roofing Co. v. OSAHRC, 528 F.2d 645 (5th Cir. 1976). If the Secretary were to be permitted to interpret regulations by employing the unusual meaning of words, employers would be deprived of fair notice of that which is expected of them in violation of their due process rights. Brennan v. OSAHRC, 505 F.2d 869 (10th Cir. 1974). In Diamond Roofing, supra, this concern was succinctly expressed:
 
 
 43
 An employer, however, is entitled to fair notice in dealing with his government. Like other statutes and regulations which allow monetary penalties against those who violate them, an occupational safety and health standard must give an employer fair warning of the conduct it prohibits or requires, and it must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents.
 
 
 44
 528 F.2d at p. 649.
 
 
 45
 Kennecott did not violate the regulation. We affirm the Commission's decision. The relief prayed for is denied. We direct enforcement of the Commission Order.
 
 
 
 [1]
 29 U.S.C. § 651(b)
 
 
 [2]
 29 U.S.C. § 665
 
 
 [3]
 29 U.S.C. § 652(5)
 
 
 [4]
 29 U.S.C. § 655(a)
 
 
 [5]
 29 U.S.C. § 652(9)
 
 
 [6]
 29 U.S.C. § 655
 
 
 [7]
 29 U.S.C. § 655(b)
 
 
 [8]
 29 CFR § 1910.28(a)(12)
 
 
 [9]
 29 U.S.C. § 651(b)
 
 
 [10]
 29 U.S.C. § 654(b)
 
 
 [11]
 American Heritage Dictionary of the English Language, Houghton-Mifflin, 1976, p. 1053