611 F.Supp. 90 (1985)
Karen COLAPIETRO, Lynn Forcier, Bruce Holland, William Jones, Janet Lofgren, Penny Plattieau, Simone Proctor, Jill Rabuano, and Peter Smith
v.
INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, DISTRICT 64, LOCAL 1142, LOCAL 883, William Martin, President 1142, Louis N. Vallende, President 883, and Robert V. Thayer, Business Representative 64.
Civ. A. No. 82-0595 P.
United States District Court, D. Rhode Island.
April 22, 1985.
*91 Gordon P. Cleary, of Vetter & White, Providence, R.I., for plaintiff.
Mark Gursky, Providence, R.I., for defendant.

OPINION
PETTINE, Senior District Judge.
The plaintiffs, nine members of the International Association of Machinists and Aerospace Workers, District Lodge 64, Local Lodges 883, and 1142, bring this action; they seek an injunction against their union which will prevent it from enforcing fines imposed on the plaintiffs for crossing a sanctioned picket line and resuming their former employment during a strike. For reasons hereinafter stated, the complaint is dismissed without prejudice.
Jurisdiction is asserted and the suit is brought pursuant to the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 401 et seq. (1970) as amended. (LMRDA).
The aforesaid district and local lodges represent employees of Brown and Sharpe Manufacturing Company (Brown & Sharpe) doing business in North Kingston, Rhode Island.
Defendant District Lodge 64 is an umbrella organization consisting of eighteen local unions throughout Rhode Island. The individual defendants are William Martin, Louis Vallende and Robert V. Thayer, various officials of the union.
This action arises from a strike against Brown & Sharpe, which was called by the union on October 19, 1981. The usual picket lines were established. In the beginning, the plaintiffs participated in the strike but, for reasons not germane to this particular controversy, they returned to their jobs; in the process, the picket lines were crossed. As a result, a charge was lodged against each individual. In the case of Jill Rabuano McLaughlin, one of the nine plaintiffs, it was dated February 4, 1982, and reads as follows: "... charges have been preferred against you under Article L of the IAMAW Constitution. The specific charge against you has been defined in Section 3 of page 119 line 24 through line 27 which states in part, `accepting employment in any capacity in an establishment where a strike or lockout exists as recognized under this Constitution without permission.' You are charged with crossing a sanctioned picket line at Brown & Sharpe Mfg. Co. during the week ending February 5, 1982." Substantially the same charge was placed against the other plaintiffs. Hearings were held by the union and individual sanctions imposed.
The plaintiffs complain they were not afforded full and fair hearings under the act, 29 U.S.C. § 411(a)(5).[1] They acknowledge *92 they pursued no internal union appeals and that this lawsuit is being financed by Brown & Sharpe Manufacturing Company, the struck employer.
The defendants counter and argue as follows: a) "[t]he complaint should be dismissed for employer financing of the lawsuit, pursuant to 29 U.S.C. § 411(a)(4).[2] Brown & Sharpe Manufacturing Company is an `Interested Employer' within the meaning of 29 U.S.C. § 411(a)(4); b) [t]he complaint should be dismissed for failure to exhaust intra-union remedies; c) [t]he disciplinary hearings conformed to or exceeded the procedural requirements of LMRDA; d) [t]here is sufficient evidence to support the decision of the Local Lodge."

Facts:
The strike in question is perhaps one of the most notorious ever held in the state of Rhode Island. It started on October 19, 1981 and is still in progress; it may well be the longest strike ever held in this country. Emotions have run high and the intransigence of all parties has not abated with time. It is claimed that Brown & Sharpe has attempted to induce the strikers to abandon the picket line and return to work; at the same time the union has pressed for the loyalty of its members. Presently there is pending before the National Labor Relations Board in Washington, forty unfair labor practices charges made by the union against Brown & Sharpe.
It was in this setting that each of the plaintiffs was granted a hearing. Jill Rabuano McLaughlin was the first of the nine plaintiffs to be heard. The sequence of events that she experienced reflect the tone and pattern, with some minor differences, of all the other plaintiff hearings.
On February 6, 1983 the plaintiff Rabuano received by certified mail, return receipt requested, the February 4, 1982 letter, supra, in which there was enclosed a hand written charge signed by Bruno Sinischalchi, a union member, alleging he had seen her cross the picket line on February 2, 1982.
On the day of the hearing Mrs. McLaughlin presented herself with her husband (she was at the time unmarried), a court reporter and personal lawyer. Defendants Robert Thayer, the union business representative and Louis Vallende, Local 883 President, were present together with Bruno Sinischalchi.
On arrival the plaintiff was advised that she alone would be permitted to attend the meeting because, if she wanted counsel, the person to act in that capacity had to be a fellow union employee; the union officials also ruled that the court reporter was unnecessary since a "written record" of the proceedings would be made by a union member; and finally, the plaintiff was told the hearing room would be cleared of everyone other than the trial committee, the plaintiff, the defendant and the trial reporter. A discussion ensued during which Mr. Sinischalchi was challenged; it was pointed out that since he signed the charge he was acting as the accuser, and since he was designated to act as chairman of the trial committee, which would be hearing the case, he would be a juror as well. As I understand the testimony, Mr. Thayer responded by saying it did not matter; the trial could still go forward; they would change their plans and not use Sinischalchi as a member of the Committee; instead he would remain as accuser. Furthermore, the plaintiff was told the union could, if it wished, press a charge different from the one she receivedI assume this means with a different accuser; thereupon, the plaintiff refused to attend the hearing and left.
Since there was no request for a postponement, the trial committee nevertheless met; Mr. Sinischalchi testified but did not participate in the deliberations of the Committee which found the plaintiff guilty; it recommended she be fined "a day's pay for each day ..." she crossed the picket line. *93 This recommended penalty had to be and was submitted for approval to the union members attending a subsequently held Local Lodge meeting. Again the testimony is not entirely clear. I conclude the membership accepted the penalty as recommended. However, the plaintiff received a letter stating she was fined:
One (1) days pay for every day of employment with the Brown & Sharpe Manufacturing Company. (Emphasis added)
This "fine" letter was received by the plaintiff on July 24, 1982, more than forty days after the penalty was affirmed by the union members, which was on June 9, 1982. It was signed by the Chairman of the plaintiff's Trial Committee and was drafted and typed by Thayer's office. The union constitution provides for prompt notification in writing of the decision of a Local Lodge and an appeal "within thirty days after the L.L. [Local Lodge] verdict." Art. L. Sec. 14, lines 29-32.
The trial of the second plaintiff, Karen Colapietro, was nothing more than a slight variation on the same theme. In this case no copy of the charge was received although there was evidence it had been mailed to her; however, it was not given to her lawyer who had asked for it. Instead of a court reporter this plaintiff sought permission to use a tape recorderthis was denied. A complaining witness different from the one who placed the charge was present as the accuser. The original complaining witness was disqualified because he himself crossed the picket line. Specifically the complaining witness stated, "I saw her cross several times in the month of March, that's the only time I saw her." The plaintiff attended the hearing but her lawyer and husband were not permitted to be present; she was found guilty on the "affirmed" testimony of the complaining witness and because she failed, "to ... make any comment on her behalf ..." This latter statement does not square with the transcript evidence which shows Sinischalchi warning the plaintiff, "I allowed you to speak your piece, I did not have to." Ex. 36, 26 p. 2.
Again the trial committee recommended a fine of "a days pay for each day she crosses." The membership accepted this recommendation but again the penalty notice the plaintiff received read:
One (1) days pay for every day of employment at Brown & Sharpe Manufacturing Company. (Emphasis added)
I do not feel that it is necessary for me to detail the events of each hearing as to the remaining plaintiffs. There were certain facts common to all, namely: a copy of the charge was not received though requested or if received it was three to six days before the hearing; the defendants displayed a general hostile attitude; in some cases neither the charging party or any other witnesses appeared; the trial committee recommended fines of a day's pay for each day the picket line was crossed, which fine was subsequently approved by the membership but the penalty letter imposed fines for each day of employment.
The exorbitant penalties imposed on each of these salaried employees range from approximately $25,000 upward to as high as $200,000, depending of their year of employment and salary received.
The defendants' answer to the foregoing facts is summarized in its brief to the court at pages 4 and 5, and is as follows:
The hearings were held at a conference room, at 78 Kenwood Street in Cranston, in an area separate from the union offices. Id. at 125. Thayer attended most of the hearings, including those involving Karen Colapietro, Lynn Forcier, Janet Lofgren, Jill McLaughlin, Penny Plattieau, and Simone Proctor. Id. at 109. He attended in his capacity as a representative of the International Union. Id. at 109; Defendant's Ex. Q. Thayer did not testify at any hearing, file any charges, sit on the trial committee or participate in its deliberations. Id. at 125. No person who was brought up on charges was denied a postponement if requested. Id. at 133. No person who *94 had filed a charge against any individual participated in trial committee deliberations. Id. at 133-134. No person was denied an opportunity to leave the hearing room to consult with counsel and the hearing room was unlocked from the inside. Id. at 134. Anyone could leave the hearing room at any time. Id. Plaintiffs' attorney, Mr. Cleary, was advised on several occasions that, pursuant to the union constitution, he could not attend the hearing, but could remain outside. Id. at 135. The union did not have an attorney in attendance. Id. at 135-136. All hearings were tape recorded, and the tape recorder was visible to all participants. Id.

After each hearing, a union meeting was held to discuss the recommendation of the trial committee. Pursuant to the union constitution, the trial committee chairman gave a synopsis of each trial, member's plea (if any), and the charges and evidence presented. The membership then voted by secret ballot. Any union member was permitted to be heard at the meetings. Id. at 139. A separate vote was taken on each recommended penalty. Id. at 140.
No decision of a local lodge was appealed by any plaintiff, although Mr. Cleary had requested the name and address of the appropriate appellate tribunal, Defendants' Ex. S, and had received that information by letter immediately. Defendants' Ex. R. Thayer Testimony at 143-144. The next step in the appeal would have been to the International President, William Wimpisinger. Id. at 146. All action is stayed pending appeal. Id. at 147, 153-154. Although the International President received copies of the notice of hearing and charges, no member of the trial committee spoke with him, he did not come to Rhode Island during the strike and he did not attend any local union meetings. Id. at 154-155.
The first argument the defendants make is that this case must be dismissed because the lawsuit is being financed by Brown & Sharpe which has an interest in and is likely to be affected by the litigation; all as proscribed by 29 U.S.C. § 411(a)(4) supra.
One of the leading cases on this issue is Adamszewski v. International Ass'n of Machinists, Local 1487, 496 F.2d 777 (7th Cir.1974); from which both sides seek support. The defendants quote the following language:
There remains the question of whether the proviso was intended to bar the employee's suit. If it did not have that effect, it would be merely precatory, for no other sanction is provided in the Act for violation of the proviso. Appearing as it does in the paragraph of the act guaranteeing the employees' right to sue in any court, it must be construed as a limitation on that right.
Id.
. . . . .
it is clear that Congress meant to prohibit an employer from financing a suit when the employer had a concrete interest in the litigation due to its relationship with the union.

Id. at 783-784.
The last quotation is also cited by the plaintiffs. They contend, however, that a "concrete interest" in litigation, as adopted by the court, means "having a share or concern in the litigation, liable to be affected by it."
There can be no dispute that the pivotal issue here is the meaning of "interested employer." All that need be said on the issue at stake has been exhaustively set forth by Judge Eachbach in the Adamszewski case, supra and by Judge Tamm in International Union Etc. v. National Right To Work, 590 F.2d 1139 (D.C.Cir. 1978). We must decide if Brown & Sharpe falls within that definition.
"From [the] background of the relevant legislative history, it is clear that Congress meant to prohibit an employer from financing a suit by a union member when the employer had a concrete interest in the litigation due to its relationship with the union. [And] [h]aving a concrete interest in the litigation means having a share or *95 concern in the litigation, liable to be affected by it." Adamszewski, supra, at 783-784.
The plaintiffs argue that if section 411(a)(4) is narrowly construed, as they claim it should be, then Brown & Sharpe is not an interested employer, because the litigation has only one purpose"to establish that the plaintiffs were not afforded due process"; they reason, "[i]f the plaintiffs win, their rights are vindicated. Brown & Sharpe gains nothing. If they lose, they face financial ruin. Brown & Sharpe loses nothing." Finally, the plaintiffs argue that the purpose of Brown & Sharpe's "payment" was not to induce strikers to return to work; as proof they point out that the [p]laintiffs learned of the financing "only from their lawyer, well after suit was commenced, and long after plaintiffs were claimed to have returned to work. Indeed one plaintiff first heard of the issue during trial." However, this is not entirely accurate; six of the plaintiffs admitted they were advised early in the litigation that it was being financed by Brown & Sharpe.
As in Adamszewski, supra, I, too, say that "[w]hether an employer is concerned with it or is liable to be affected by it or has some self interest in it, must necessarily be determined in the factual context which gave rise to the litigation." Id. at 784. Anyone who lives in Rhode Island and has, at least, a modicum of interest in the news and the economic well being of this state knows of the enormity of the strike and the resulting impassioned intransigence of the opposing factions. I accept the testimony of the defendant Thayer who stated that Brown & Sharpe attempted to induce strikers to abandon the picket line and return to work by employing newspaper advertisements, letters and direct telephone conversations with employees; the union responded by calling special meetings to rebut what it claimed was misinformation being disseminated by Brown & Sharpe and its "further continuing effort ... to break the union, and undermine the union's collective authority." And, as I have already stated, the union resorted to filing forty unfair labor practices charges with the National Labor Relations Board, alleging that Brown & Sharpe did not negotiate in good faith and caused the strike. As the defendants state in their brief, "[a]pproximately twenty of [the charges] were filed through September of 1982. Eventually the charges were found to have merit and Brown & Sharpe was charged in a complaint with numerous unfair labor practices. A trial commenced, but the company appealed and the matter is pending before the National Labor Relations Board in Washington." It seems clear to me this is the classic setting in which an employer would be motivated to encourage suits by its employees against their union.
It is clear from the record that the employer involved itself in this case by directly financing the litigation. The record provides no alternative explanation for how one of the state's prestigious law firms came to represent these plaintiffs. There is not a scintilla of evidence that any one of the plaintiffs themselves retained counsel. There is likewise no evidence that one or several of the plaintiffs independently instigated the legal action and then subsequently accepted present counsel. Finally, this is not a case in which the employer merely contributed finances to a bona fide independent legal aid organization who in turn represented plaintiffs. If it were so, the picture would change, since the employer's involvement could fairly be characterized as indirect. See International Union, supra, 590 F.2d at 1139.
I find that it is sheer sophistry to say that the direct financing of this lawsuit by Brown & Sharpe is not tantamount to employer influence in the dispute. "Congress apparently was concerned that if employers were permitted to encourage, finance, or participate in suits by their employees against unions, they would be able, through subtle coercion or otherwise, to lead union members into action contrary to the members' desires or best interests." International Union, 590 F.2d at 1149 (emphasis added). The whole purpose of the section in question is to "keep employer influence out of disputes between union members and their unions by making it *96 `against the law, for an employer or an employer association, directly or indirectly, to spend any money or otherwise get into that type of situation, unless it were a party.'" Id. citing II NLRB, Legislative History of LMRDA at 1237.
There is no doubt that the plaintiffs deliberately crossed the picket lines and for doing this the union has the right to discipline themif it had no disciplinary powers "it would disintegrate". NLRB v. Boeing Co., 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973). Brown & Sharpe's financial support of this litigation, if approved, can lead to a proliferation of such suits; if this happens, one of the strongest weapons the union hasthe picket linewill be virtually negated.
I find defendant Thayer's testimony captures the very core of the opposing factions' respective aims:
[t]he Union's only course of action in that situation is to keep the morale, keep the picket line up in hopes that economic sanctions by not being able to ship the products will bring the company to their senses in that case. If, as time goes on, and the adversities set in, and the people start to have second thoughts, can I withstand it any longer? I am about to lose my house, and the company can impede the process and just make it so difficult that it is meaningless, then, certainly, they gain the upper hand, hey, you can cross the picket line, and we are going to finance your legal battle for you. Maybe the union can bring you up on charges, but its assurance is, come on in and we will take care of the bill as far as legalities go, and then they've broken the union.
Trial Transcript, Vol. 2, p. 156.
I am constrained to conclude that on the grounds herein discussed I have no alternative but to dismiss the complaint; however, I do so without prejudice to the plaintiffs' rights to bring another action provided it is not financed by Brown & Sharpe. As a result of this ruling, I do not reach the statutory due process issues.
In the interest of fundamental fairness, justice and the avoidance of needless future suits, it might be wise for the union to reconsider the procedures it used against the plaintiffs. Disciplinary measures may be a sine qua non for union effectiveness but only in the context of the Landrum-Griffin Act which vests union members with certain procedural rights; specifically, the member must be "afforded a full and fair hearing."
The importance of these procedural provisions is accentuated by the magnitude of the penalty the Union imposed in this caseindividual fines ranging from approximately $20,000 to $200,000. The Union should be assured that were it not for the employer's illegal involvement in this suit, I would have rigorously scrutinized the fairness of the procedures it employed.
Counsel will prepare an order in keeping with this Opinion.
NOTES
[1] 29 U.S.C. § 411(a)(5) reads:

(5) Safeguards against improper disciplinary action.No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.
(b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect.
Pub.L. 86-257, Title I, § 101, Sept. 14, 1959, 73 Stat. 522.
[2] 29 U.S.C. § 411(a)(4) reads in pertinent part:

[N]o interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance or petition.