LOCAL 4453, USA, AFL–CIO, Plaintiff-Respondent, v. WILSON, Defendant-Appellant.

Supreme Court

*No. 76–274. Submitted on briefs March 28, 1979.— Decided May 1, 1979.*
(Also reported in 277 N.W.2d 809.)

For the appellant the cause was submitted on the brief of *Eisenberg & Kletzke* of Milwaukee.

For the respondent the cause was submitted on the brief of *Zubrensky, Padden, Graf & Bratt* of Milwaukee.

CONNOR T. HANSEN, J.   Two witnesses testified at trial, Raymond F. Blasky, then president of the union, and Wilson.

Blasky testified to the following facts.  In 1971, Wilson was an employee of the American Can Co. and a member of the respondent union.  On February 4th of that year at a general meeting of the union the membership voted, in anticipation of a strike, to assess a fine of $25 for each failure to perform picket duty.  A strike administration committee was also appointed.  About a week before the strike this committee set up a procedure for making picket assignments.  Employees were notified of their weekly four-hour picketing assignments.  The union's international president approved the strike on February 14th when the contract expired.  The strike continued for four weeks.

Following the strike, the committee met with the picket captains to review the attendance records.  They found that 40 out of a total of 1,000 employees had failed to perform all or part of their picket duty.  Article IX, section 4, of the union's by-laws provided:

"Section 4.   Any member who fails to perform picket duty during a strike which has been approved by the International President, and who does not have an excuse for not performing such duty which is satisfactory

to the Strike Administration Committee, shall be considered in violation of ARTICLE IX, Section 1(m) of these By-Laws, and shall be fined for each such nonperformance an amount which shall be established by the membership at a regular or special meeting, but which shall in no event exceed twenty-five (25) dollars."[1]

The by-laws did not indicate what excuses would be satisfactory. That determination was left to the committee members. On April 10th the committee sent letters to those 40 employees, including Wilson, inviting them to appear before the committee to explain their failure to picket. These meetings were held April 13th through 16th. Following these meetings the committee determined that 15 employees who did not have a satisfactory excuse for failing to picket had not as yet paid their fine. At a general membership meeting on May 6th the committee requested that these 15 employees be brought before the trial committee. Thirteen of these fifteen employees ultimately paid fines. The other employee, besides Wilson, who did not pay the fine, appealed the trial committee's decision to the international committee in accordance with union procedures and was exonerated. Although Wilson was informed of these appeal rights at the hearing before the trial committee, he did not pursue this remedy. The specific request to the union membership for a charge against Wilson said that he had failed to perform picket duty on four days and had failed to pay the fine assessed. The membership approved the strike committee's request. Wilson was subsequently sent a letter by the union secretary containing a copy of the strike committee's charge of failing to

---

[1] *"ARTICLE IX DISCIPLINE*

"Section 1. Any member may be penalized for committing any one or more of the following offences: . . . (m) deliberately engaging in conduct in violation of the responsibility of members toward the organization as an institution, . . ."

picket on February 20th and 27th and March 6th and 13th. The letter informed him that the union was of the opinion he should be subject to discipline and that a hearing had been scheduled for May 28th.

Wilson attended this hearing before the three-member trial committee. A representative of the strike committee told the trial committee that Wilson's excuse had been that he had to take care of his father's tavern while his father was hospitalized. A trial committee member asked Wilson if the tavern work required 24 hours a day. Wilson then told the trial committee that he refused to picket because the strike and defense fund was distributed unfairly on the basis of need rather than to all employees and because the union discriminated against blacks in failing to appoint them to committee positions. Blasky, who also attended the hearing, told Wilson that the strike fund had not been received from the international union until March 15th and therefore could not be distributed during the strike. He explained that only a small amount of local funds was available during the strike and that this was distributed after the first week, to those who needed help most. Blasky reminded Wilson that when they spoke by telephone during the first week of the strike that Wilson had said he wouldn't picket. Blasky also said that committee appointments were made on the basis of qualifications and that there were few executive board openings to fill. Wilson did not respond to these explanations beyond saying that the strike fund should have been distributed by right rather than need. Wilson also told Blasky that he had to take four pills a day to stay at the company, that during the strike he had been involved in an accident trial with company representatives, that the $100 meant nothing to him, that he would volunteer to pay it and that he made more than that each day outside the company. Wilson further told him that when this action came to trial he would have three psychiatrists, a nerve specialist and nine

medical doctors testify. Wilson also said that employees who weren't needy had received strike money, but as he refused to say who, the union could not take action.

Blasky also testified that the hearing was the first time he had heard of Wilson's complaints about the union. He said Wilson had complained to him before about racial discrimination by the company and that he had offered to assist Wilson in bringing a complaint against the company. Blasky pointed out that Verdice Johnson, a black woman, was a member of Wilson's trial committee. He also said that despite Wilson's mention of pills and doctors he never said the failure to picket was due to his physical or mental condition. He said Wilson had told him, in connection with the accident trial during the strike, that his company medical file was three inches thick. However, in the year prior to the strike Wilson had missed only three days of work and in the year after he missed only five days. Wilson worked up until the strike and went back to work immediately afterwards. Blasky said Wilson never challenged the fairness of the hearing or the committee's right to hear the case and didn't ask to present additional testimony. Blasky explained that acceptable reasons for failing to picket would include being on a leave of absence or religious reasons.

The written decision of the trial committee was offered and received in evidence at trial. The decision found that Wilson had failed to picket on February 20th and 27th and March 6th and 13th, that he had been notified to appear before the strike committee on April 16th and had done so and that he had also appeared before the trial committee on May 28th. The decision said Wilson's reasons were that he had to take care of his father's tavern while his father was hospitalized, that he wouldn't picket unless he was paid to do so and that he had no use for the union. The decision recommended that Wilson be found guilty and fined $100. The fact that this decision would be presented for ratification or

rejection at a general membership meeting on July 1st was posted on company bulletin boards for a week prior to the meeting. The decision was ratified on July 1st and on July 7th Wilson was sent a letter notifying him of the membership's approval of the committee's decision and informing him that the $100 fine was due by October 29, 1971.

Wilson testified that he refused to picket for three reasons, his father's hospitalization, his dissatisfaction with the union for racial discrimination and the unequal distribution of strike funds. He explained that he had disagreed with the union since 1955 because it allowed the company to discriminate in promotions and because the union itself didn't appoint blacks to steward and committee positions. He said his refusal to picket was his way of bucking the system. He said his father was hospitalized following surgery for two of the four weeks of the strike and that during this time he spent about seven hours per day at the tavern supervising the employees, handling the receipts and ordering stock. He said he had also helped out at the tavern this way the first time his father was hospitalized before the strike began.

Wilson said he had also been having his own medical problems. This reason was first raised in Wilson's Amended Answer to which he attached a letter from a psychiatrist which indicated that from April 16 to July 20, 1971, Wilson was anxious and obsessed and that picketing would have aggravated this condition. This letter was not placed in evidence. At trial Wilson said he had been under a doctor's care since 1961, that he had seen a psychiatrist who refused to treat him after 1971 unless he quit his job and that these doctors had told him the company was the cause of his problems. He said he hadn't worked a full year since 1971, and that he had finally quit the job the previous week.

The trial court submitted the following special verdict question:

"Question No. 1. Was the finding of guilty of the defendant, A. J. Wilson, by the Trial Committee of Local Union 4453, United States Steel Workers of America, for failing to perform picket duty on February 20th, February 27th, March 3rd, and March 6th, 1971 reasonable?"

Five of the six jurors answered the question "yes" and judgment in favor of the union was entered accordingly.

This case concerns questions of the internal management of a labor union and its disciplinary authority over its members. We believe it is well established that these questions of internal management and membership discipline are governed by the constitution and by-laws of the union, which constitute a contract between the union and its members, which contract may be enforced in state courts. *Local 248 UAW v. Natzke,* 36 Wis.2d 237, 248, 249, 153 N.W.2d 602 (1967) ; *United Automobile, A. & A. I. Workers v. Woychik,* 5 Wis.2d 528, 530, 531, 93 N.W.2d 336 (1958), and cases cited therein.

Wilson contends that the decision of the trial committee that his excuse for not picketing was unsatisfactory is not supported by the evidence. He also contends that the disciplinary procedure of the union violated his right to due process. This is so, he argues, because the members of the trial committee, as members of the union, could not afford him a fair and impartial hearing due to their own bias.

In *United Automobile A. & A. I. Workers v. Woychik, supra,* where the union imposed a fine against a member for not picketing, then sought to enforce the fine in court, this court said the sole issue was whether the union's by-law conditions for levying a fine had been complied with. The court also said that:

". . . Any reasonable or permissible construction which an organization or a union gives to its own constitution, laws, or rules will govern unless clearly subversive of personal or property rights. . . ." *Id.* at 534.

The United States Supreme Court has considered the broad disciplinary powers of unions on several occasions. In *NLRB v. Allis Chalmers Mfg. Co.*, 388 U.S. 175 (1967), the Court said:

"Integral to this federal labor policy has been the power in the chosen union to protect against erosion its status under that policy through reasonable discipline of members who violate rules and regulations governing membership. That power is particularly vital when the members engage in strikes. The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms, and '[t]he power to fine or expel strikebreakers is essential if the union is to be an effective bargaining agent. . . .' Provisions in union constitutions and bylaws for fines and expulsion of recalcitrants, including strikebreakers, are therefore commonplace and were commonplace at the time of the Taft-Hartley amendments.

"In addition, the judicial view current at the time §8(b)(1)(A) was passed was that provisions defining punishable conduct and the procedures for trial and appeal constituted part of the contract between member and union and that 'The courts' role is but to enforce the contract.' In *Machinists v. Gonzales*, 356 U.S. 617, 618, we recognized that '[t]his contractual conception of the relation between a member and his union widely prevails in this country. . . .' Although state courts were reluctant to intervene in internal union affairs, a body of law establishing standards of fairness in the enforcement of union discipline grew up around this contract doctrine. . . ." *Id.* at 181–183.

In *Scofield v. NLRB*, 394 U.S. 423 (1969), the Court said a union disciplinary fine could be enforced in a state court where

". . . there is no showing in the record that the fines were unreasonable or the mere fiat of a union leader, or that the membership of petitioners in the union was involuntary. . . . the enforcement of the rule was not

carried out through means unacceptable in themselves, such as violence or employer discrimination. It was enforced solely through the internal technique of union fines, collected by threat or expulsion or judicial action. . . ." *Id.* at 430, 431.

The role of a state court in reviewing a union disciplinary proceeding was given detailed consideration in *International Brotherhood of Boilermakers v. Hardeman,* 401 U.S. 233 (1971), where a union member brought an action for wrongful expulsion. The Court said the critical issue was whether the union disciplinary proceedings had denied the member a full and fair hearing within the meaning of sec. 101(a)(5) of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C., sec. 411(a)(5), which provides:

"(5) Safeguards against improper disciplinary action. —No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing."

With regard to the first requirement the Court said the reviewing court's duties would be limited to determining that a specific written charge was in fact served which informed the union member of the offense committed. Where the charge refers to a specific constitution or by-law provision the court may determine whether the member was misled or prejudiced by the charge. However the reviewing court cannot "scrutinize the union regulations in order to determine whether particular conduct may be punished at all." *Id.* at 245. The Court explained that the union has the sole authority to interpret its regulations "to determine the scope of offenses warranting discipline. . . ." *Id.* at 243.

In this case there is absolutely no question that Wilson had adequate notice of the specific charges and a reasonable time to prepare his defense. The union carefully followed the disciplinary procedures set forth in its constitution and by-laws. We do not here consider whether the failure of Wilson to pursue internal union review procedures precluded him from challenging any procedural defect because there is nothing in the record to support such a challenge.[2] The contention of Wilson that the members of the union trial committee were biased and unfair because they were union members is without merit. These committees were established pursuant to the constitution and by-laws of the union of which he was a member. As the United States Supreme Court pointed out in *NLRB v. Allis-Chalmers, Mfg. Co.,* *supra,* a union's strength depends on its ability to deal with disciplinary problems internally. There is no showing in this record that fines were unreasonable, or the mere fiat of a union leader, or that Wilson's membership in the union was involuntary. *Scofield v. NLRB, supra,* at 430. An employee may disagree with a union decision; nevertheless, the employee is bound by it. Complete satisfaction of all who are represented is hardly to be expected. The requirements of adherence to democratic principles, fair procedures and free speech, apply to disciplinary proceedings against union members. Here the procedures followed fully comport with these requirements and were in every way fair and democratic.

There remains the question of whether the evidence is sufficient to support finding that Wilson had failed to

---

[2] *See: Browne v. Milwaukee Bd. of School Directors,* 69 Wis.2d 169, 230 N.W.2d 704 (1975); *UAW, Local 283 v. Scofield,* 50 Wis.2d 117, 183 N.W.2d 103 (1971); *Kopke v. Ranney,* 16 Wis.2d 369, 114 N.W.2d 485 (1962).

picket on the four days in question. The scope of judicial review on this issue is very limited:

". . . Section 101(a)(5)(C) of the LMRDA guarantees union members a 'full and fair' disciplinary hearing, and the parties and the lower federal courts are in full agreement that this guarantee requires the charging party to provide some evidence at the disciplinary hearing to support the charges made. This is the proper standard of judicial review. We have repeatedly held that conviction on charges unsupported by any evidence is a denial of due process, [citations omitted] and we feel that §101(a)(5)(C) may fairly be said to import a similar requirement into union disciplinary proceedings. . . ." *International Brotherhood of Boilermakers v. Hardeman, supra,* at 245, 246.

This was the standard applied in both federal and state courts prior to the enactment of the LMRDA. *Lewis v. American Fed. State, County & M. Emp.,* 407 Fed.2d 1185, 1192–1194 (3rd Cir. 1969).

Here, Wilson admitted that he refused to perform his picketing assignments. He was clearly in violation of the written union rule. The question before the committee was whether he had a satisfactory excuse for doing so. Excuses acceptable to the trial committee were similar to those excusing an employee from work, such as religious reasons and leaves of absence. Wilson admitted he was not working in his father's tavern 24 hours a day. His own hearing testimony that his father was hospitalized during only two of the four weeks of the strike and that he had also filled in at the tavern before the strike began while he continued to work full time demonstrated that his father's illness did not prevent him from picketing four hours a week.

Wilson's reliance on his own medical problems was equally ineffective as he failed to show that he even saw a doctor during the four week strike. He was absent

from work because of illness for three days during the year prior to the strike and five days during the year following the strike. Obviously, from the trial committee's viewpoint, there was no showing as to why illness should have kept him from picket duty. Also, his assertions concerning financial and racial discrimination by the union are made with no evidentiary support. We find them singularly unimpressive and made with no factual basis. The judgment of the trial court is affirmed.

*By the Court.*—Judgment affirmed.

COFFEY, J., took no part.