LOCAL 165, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, Plaintiff-Appellee, v. RONALD C. BRADLEY *et al.*, Defendants-Appellants.

First District (2nd Division) Nos. 85—2225, 85—2226 cons.

Opinion filed October 7, 1986.—Rehearing denied November 12, 1986.

Seyfarth, Shaw, Fairweather & Geraldson, of Chicago (Ronald L. Lipinski, of counsel), for appellants.

Doss, Puchalski, Keenan, Bargiel, Ltd., of Chicago (Joseph Keenan, of counsel), for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

Defendants, Ronald C. Bradley and Andrew J. Stankoskey, two union members, appeal from the circuit court's grant of summary judgment and award of $1,357 against each of them in a contract action filed by their union because they worked during a strike. We affirm.

On June 4, 1984, Local 165, International Brotherhood of Electrical Workers (IBEW), (hereinafter referred to as plaintiff) filed a small

claims suit against Bradley. The complaint alleged that on August 7, 1983, the union went on an economic strike against Illinois Bell Telephone Company. Pickets were established at Bell until August 23, 1983. Following settlement of the strike, plaintiff asked defendant Bradley to appear at a hearing before its trial board to answer allegations that he had crossed the picket line during the strike. The trial board found Bradley guilty and assessed $1,357 against him and barred him from membership meetings for five years.

On September 4, 1983, plaintiff filed a small claims suit in the circuit court against Stankoskey. The complaint alleged that plaintiff mailed to defendant Stankoskey a copy of the charges against him for crossing the picket line and a notice of time and date of a hearing. The trial board found Stankoskey guilty of crossing a picket line and assessed a fine of $1,357 against him and barred him from membership meetings for five years.

Plaintiff filed motions for summary judgment against both defendants, asserting that it had demanded the assessment but that defendants had refused to pay. The motion against Bradley indicated that he received written notice on October 3, 1983, but that he did not attend the October 10 hearing. Two union members, John F. Cheeseman and Dewey Viars, testified that they observed Bradley crossing the picket line and working throughout the strike. The trial board found Bradley guilty and mailed a notice of the decision and his appeal rights to Bradley's last known address on October 28, 1983, but he did not appeal the decision within the union. Similarly, the summary judgment motion against Stankoskey asserted that he received notice on October 7, 1983, and that the trial board held a hearing 10 days later, on October 17, 1983. Stankoskey did not appear at the hearing. Written charges by union member James Leamy, that defendant crossed the picket line and worked throughout the strike, were read into the record. Leamy testified that he had nothing to add to the written charges. The trial board found Stankoskey guilty of the charges and mailed a copy of the decision and notice of appeal rights to Stankoskey's last known address, but he did not appeal the decision of the trial board. Attached to both motions for summary judgment were the notices of charges against defendants, the relevant portions of the IBEW constitution, notices of the trial board's decision and appeal rights, and an affidavit by Hazel Mann, who sat on the trial board, that she knew from personal knowledge that the facts set forth in the motions for summary judgment were true.

In opposition to summary judgment, defendants filed identical affidavits stating that they never received copies and were never in-

formed of the contents of the IBEW constitution or the bylaws for Local 165. Defendants asserted that they were never told that the IBEW constitution contained disciplinary provisions which were enforceable in State court. They contended that they had remained members of the union during the strike because they were never informed of their right to resign from it without forfeiting their jobs, and stated:

> "That in July of 1983, the Union conducted a Strike Authorization Vote. The membership including affiant, was advised by the Union that the Strike vote was for the limited purpose of letting the Company know that the members stood behind their bargaining committee. The membership, including affiant, was told by the Union that a second vote would be taken before a Strike was called and that under the I.B.E.W. Rules any final offer made by the Company would be sent to the members for a vote. No second vote was ever taken."

Attached to defendants' memoranda in opposition to summary judgment were what appear to be reports of the trial board proceedings against the two defendants, and a photocopy of the front page of the Local 165 Communicator, plaintiff's official newsletter. Conspicuously at the top of the front page, under the heading "Strike Authorization Vote," the newsletter says:

> "Strike authorization is our most important bargaining tool. It is an invaluable part of the negotiating process, no matter what the company has or has not offered. It lets the company know that we stand behind our bargaining committees."

Two paragraphs later, in boldface, it states:

> "Remember: A Strike Authorization does not mean we are going out on strike. Under our IBEW rules, the final offer made by the company must be sent out for a vote.
>
> IT IS IMPORTANT THAT WE ALL PARTICIPATE."

In reply to defendant's memorandum and documents, plaintiff filed an affidavit by John F. Cheeseman, who had been a member of the Local 165 executive board since August 1982. Cheeseman stated that Local 165 was part of the nationwide collective bargaining that IBEW conducted with AT&T in the summer of 1983, and that it was bound by the conduct of the two larger entities. Cheeseman added that copies of the IBEW constitution and the bylaws of Local 165 were available on request at the business office of Local 165 and at each jobsite.

Plaintiff also filed a certified copy of an affidavit by Arthur Perry, who was director of the telephone department of the IBEW in Au-

gust, 1983 and chief negotiator for the IBEW's committee of international and local union representatives, that negotiated the collective-bargaining agreements between AT&T and its subsidiary companies and various locals, including that between Illinois Bell and Local 165. Perry stated that the members of Local 165 had authorized a strike if the terms of a new collective-bargaining agreement were not reached by August 6, 1983, the end of the then-existing agreement. He added that the IBEW constitution requires that the international president give his approval before members engage in a strike. Perry then stated:

"4. Following the conclusion of negotiations on Friday, August 5, 1983, I spoke with Anthony J. Salamone, Administrative Assistant to International President Charles H. Pillard ***. Mr. Salamone advised me that, in accordance with the provisions of the International Constitution, and consistent with IBEW policies and procedures, President Pillard had authorized a strike to be called against the AT&T System, including Illinois Bell Telephone Company, if AT&T refused to make its final offer by midnight, August 6. Such a strike would involve all IBEW members employed in the AT&T System, including those members of Local 165, IBEW, employed by Illinois Bell.

5. At the negotiation meeting on Saturday, August 6, 1983, the AT&T representatives refused to present the Company's final offer to the representatives of the IBEW. After that final negotiating session on August 6, I carried out the strike sanction authorized by President Pillard, and advised the IBEW representatives that a strike would commence on August 7, 1983, because AT&T representatives had not given a final offer to the IBEW. I further advised the IBEW representatives that there was no need for the Local Unions to conduct votes concerning a final offer, because the Company had made no such final offer."

Plaintiff also filed a copy of the tally, by an election judge, of the strike authorization vote dated July 27, 1983. It indicated that the strike authorization vote of Local 165 on national issues was yes: 1330 to no: 720, and yes: 1447 to no: 847 on local items.

Based on the foregoing, the circuit court granted plaintiff's motions for summary judgment against Bradley and Stankoskey on June 27, 1985. Defendant's appeals have been consolidated.

■ The United States Supreme Court has approved of State court jurisdiction over union suits to collect fines from members for violation of union rules. In *NLRB v. Allis-Chalmers Manufacturing*

*Co.* (1967), 388 U.S. 175, 18 L. Ed. 2d 1123, 87 S. Ct. 2001, several employees who were members of a striking union crossed picket lines to work. Once the strike was settled, the union imposed fines on those workers and sought to collect them in Wisconsin State court. The National Labor Relations Board dismissed the workers' complaint that the fines were an unfair labor practice (see 29 U.S.C.A. sec. 158(b)(1)(A) (West 1973)), but the Seventh Circuit disagreed. The Supreme Court reversed the court of appeals. The Supreme Court held that the legislative history of the Labor-Management Relations Act of 1947 (61 Stat. 136-62 (1947)), showed no intent to prevent labor unions from using reasonable means to control the loyalty of its members, especially during the strained period of an economic strike. According to the court, surrendering the right to bargain with the employer as an individual and pooling economic strength is inherent in joining a union. If a union is to function as a viable unit, the court noted, it must be free to compel members to abide by the terms of their membership contracts and the decisions of the majority of the membership. Members are protected from union overreaching by the union's duty of fair representation. Moreover, the court stated that to interpret section 8(b)(1) of the Labor-Management Relations Act (29 U.S.C.A. sec. 158(b)(1)), which prohibits union coercion of employees in the exercise of their rights, to apply to the imposition and collection of fines:

> "would be to impute to Congress a concern with the permissible *means* of enforcement of union fines and to attribute to Congress a narrow and discrete interest in banning court enforcement of such fines. Yet there is not one word in the legislative history evidencing any such congressional concern. And, as we have pointed out, a distinction between court enforcement and expulsion [which is permitted under 29 U.S.C.A. 158(b)(1)(A)] would have been anomalous for several reasons. First, Congress was operating within the context of the 'contract theory' of the union-member relationship which widely prevailed at that time. The efficacy of a contract is precisely its legal enforceability. A lawsuit is and has been the ordinary way by which performance of private money obligations is compelled. Second, as we have noted, such a distinction would visit upon the member of a strong union a potentially more severe punishment than court enforcement of fines, while impairing the bargaining facility of the weak union by requiring it either to condone misconduct or deplete its ranks. (Emphasis in original.) (*NLRB v. Allis-Chalmers Manufacturing Co.* (1967), 388

U.S. 175, 192, 18 L. Ed. 2d 1123, 1134, 87 S. Ct. 2001, 2013.) See also *NLRB v. Boeing Co.* (1973), 412 U.S. 67, 75-78, 36 L. Ed. 2d 752, 758-60, 93 S. Ct. 1952, 1957-59.

■ The parties have not cited, and our research has not uncovered, any reported decision in this State affirming the award of a union fine in a suit against a member. In *American Federation of Technical Engineers, Local 144 v. La Jeunesse* (1976), 63 Ill. 2d 263, 347 N.E.2d 712, our supreme court affirmed the dismissal of a fine-collection action against members who crossed a picket line, because until the legislature amended section 2—209.1 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—209.1), a union did not have the capacity to sue in actions at law in the courts of Illinois. (See also *Beagley v. Andel* (1978), 58 Ill. App. 3d 588, 374 N.E.2d 929, *cert. denied* (1979), 440 U.S. 917, 59 L. Ed. 2d 467, 99 S. Ct. 1235; *Payne v. Collier* (1976), 38 Ill. App. 3d 201, 347 N.E.2d 863.) In *Local 336, International Brotherhood of Electrical Workers v. Angelacos* (1986), 144 Ill. App. 3d 1060, 495 N.E.2d 179, the Second District affirmed the dismissal of such a suit because it was barred by a judgment of dismissal in prior litigation between the union and the member fined for crossing the picket line. Similarly, in *International Brotherhood of Electrical Workers Local No. 399 v. Zoll* (1985), 135 Ill. App. 3d 910, 482 N.E.2d 446, the Fourth District affirmed the dismissal of a small claims action against a member for an assessment for crossing a picket line. The court ruled that because the union's certified letter to defendant, indicating the charges and union hearing date, was returned marked "refused," defendant had not received the notice required to collect the fine under State law. Finally, in *United Steelworkers of America, Local 5292 v. Bailey* (1975), 29 Ill. App. 3d 392, 329 N.E.2d 867, the employer appealed from a denial of its request to intervene in such a union suit, but the Second District affirmed the trial court's denial of intervention without otherwise commenting on the validity of the underlying suit. Courts in other States have allowed suits against members to collect union fines. (See *Local 248, UAW v. Natzke* (1967), 36 Wis. 2d 237, 153 N.W.2d 602; Annot., 13 A.L.R.3d 1004 (1967) (and cases cited therein).) Moreover, the law is well settled in Illinois that the constitution and bylaws of labor unions are contracts binding upon the union and its members. (*Illinois Education Association v. Illinois Federation of Teachers* (1982), 107 Ill. App. 3d 686, 689, 437 N.E.2d 1265, 1267; *Napier v. Fireman's Association* (1973), 9 Ill. App. 3d 975, 978, 293 N.E.2d 384, 386; *Webster v. Midland Electric Coal Corp.* (1963), 43 Ill. App. 2d 359, 369, 193 N.E.2d 212, 217. See also *Scofield v. NLRB* (1969), 394 U.S. 423, 22

L. Ed. 2d 385, 89 S. Ct. 1154; *International Association of Machinists v. Gonzales* (1958), 356 U.S. 617, 618, 2 L. Ed. 2d 1018, 1020, 78 S. Ct. 923, 924.) We conclude that there is no question but that a suit such as this, to collect union fines, can be filed in Illinois circuit courts.

■ Although they are clearly contracts, the bylaws and constitutions of unincorporated associations and unions have been historically regarded as unique. In *Michel v. Carpenters' District Council* (1957), 12 Ill. App. 2d 510, 140 N.E.2d 299, for example, three members filed suit against their union seeking damages and an order setting aside a $500 fine and five-year suspension from the union imposed upon each of them for violation of the union constitution. The union asserted that the suit was barred because the plaintiffs did not utilize their rights of appeal within the union. The Fourth District agreed, noting that with the exception of claims of insufficiency of notice of union trial:

> "A member of a voluntary association necessarily agrees to the reasonable rules and regulations of the order. *Bostedo v. Chicago Board of Trade* [(1907)], 227 Ill. 90, 81 N.E. 42. He must avail himself of the remedies provided by his association, before asking for equitable relief. *Engel v. Walsh* [(1913)], 258 Ill. 98, 101 N.E. 222.
>
> ***
>
> The plaintiffs in this case have failed by any apt averments to bring themselves within any of the exceptions. Therefore the trial court properly held the convictions and sentences were not subject to review by the court. The claims for damages depend upon a reversal of those convictions and sentences, hence they also fail." (12 Ill. App. 2d 510, 513, 140 N.E.2d 299, 300.)

(See also *Webster v. Midland Electric Corp.* (1963) 43 Ill. App. 2d 359, 369-70, 193 N.E.2d 212, 217, *cert. denied* (1964), 377 U.S. 964, 12 L. Ed. 2d 735, 84 S. Ct. 1645.) Similarly, section 101(4) of the Labor-Management Reporting & Disclosure Act (29 U.S.C.A. sec. 411(4) (West 1985)) states that no union shall limit the rights of members to institute suit against it in any court, *"[p]rovided*, [t]hat any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof." (Emphasis added.)

■ Defendants had a right to appeal the decision of the local union's trial board, but they did not do so. It might be argued that, if an exhaustion provision exists under the IBEW constitution or Local 165

bylaws, defendants' failure to exhaust intraunion remedies is a waiver of any objections to the fines. However, we do not find it so. This is not a suit against a union or union official brought by a union member, to which the Labor-Management Reporting & Disclosure Act section 101 (29 U.S.C.A. sec. 411 (West (1985)), or the decision in *Michel* expressly apply. Rather, it is a suit brought by a union to collect union fines by obtaining a money judgment in our courts that is enforceable by the full coercive power of this State. As noted above, the union is free to file such a suit, but it must abide by the same principles of contract law that would apply to any other litigant. Plaintiff does not contend that the union constitution and bylaws contain language that would set the arbitration provision of the Uniform Arbitration Act (Ill. Rev. Stat. 1985, ch. 10, pars. 101 through 123) into operation. (Compare *Van C. Argiris & Co. v. Pain/Wetzel & Associates, Inc.* (1978), 63 Ill. App. 3d 993, 380 N.E.2d 825.) We find no Federal or State law principle that defendants' failure to appear and defend before the union's trial board, or to appeal within the union, prevents this court from determining whether the prerequisites for a contract action have been met. Consequently, we proceed to consider the merits of defendants' arguments.

■ Defendants were fined pursuant to article 27 of the IBEW constitution. It provides in relevant part:

> "Section 1. Any member may be penalized for committing any one or more of the following offenses:
>
> * * *
>
> (17) Working for any individual or company declared in difficulty with a [Local Union] or the I.B.E.W., in accordance with this Constitution.
>
> * * *
>
> Any member convicted of any one or more of the above-named offenses may be assessed or suspended, or both, or expelled."

Defendants first contend that the fine against them is improper because the phrase "declared in difficulty" is ambiguous and did not put them on notice that they could not work during a strike. This argument proves too much. Under section 501(2) of the National Labor Relations Act (NLRA) the term "strike" includes any concerted interruption of operations by employees including a work stoppage by reason of the expiration of a collective-bargaining agreement. (29 U.S.C.A. sec. 142(2) (West 1973).) When a union prohibits its members from working for their employer—that is a strike. Article 17, section 12, of the I.B.E.W. constitution prohibits local-union work stoppages

without the authorization of the president of the international union. Upon seeing the picket lines, it would have been obvious to anyone that Illinois Bell had been "declared in difficulty" with the union; indeed, it would be hard to imagine any greater difficulty between the union and the employer.

■ Defendants next argue that the circuit court erred in entering summary judgment for plaintiff because there is a material issue of fact as to whether the strike of August 1983 was duly authorized[1] Summary judgment is proper if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there are no issues of material fact and that the moving party is entitled to judgment as a matter of law. (*In re Estate of Garbalinski* (1983), 120 Ill. App. 3d 767, 770, 458 N.E.2d 1065, 1068; Ill Rev. Stat. 1985, ch. 110, par. 2—1005.) A copy of the IBEW constitution, as amended in September 1982, is included in the record. Although there is no provision in the constitution explicitly setting out the procedures for calling a strike, it appears that, at the time of the picketing, nothing in the constitution required a vote of the membership to declare a valid strike. As previously stated, the strike at issue here was called by IBEW international president Pillard, and it is clear that he had the authority to do so. Article 17, section 12, prohibits local-union work stoppages without the prior consent of the international president. By implication, this provision empowers the international president to call for a work stoppage or strike. In addition, article 4, section 3, authorizes the international president or his representative to enter into agreements with any firm doing an interstate business in electrical work covering the entire jurisdiction of the IBEW, except where a local-union agreement covering such employment already exists. Furthermore, the 31st International Convention adopted a statement that: "[w]hen negotiating agreements with any *** association of employers, *** or firm doing an inter-state or inter-provincial business in electrical work, it is imperative that the [international president] have the authority to negotiate and enter into these agreements, or with-

---

[1]The Supreme Court in *International Brotherhood of Boilermakers v. Hardeman* (1971), 401 U.S. 233, 244, 28 L. Ed. 2d 10, 20, 91 S. Ct. 609, 616, noted that section 101 of the Labor-Management Reporting & Disclosure Act, discussed later in this opinion, was not intended to authorize Federal courts to construe written union rules to determine whether particular conduct, found to be a violation by the union, actually falls within their scope. The court noted, however, that State law may go further. (401 U.S. 233, 244 n.11, 28 L. Ed. 2d 10, 20 n.11, 91 S. Ct. 609, 616 n.11.) We assume, without deciding, that Illinois contract law would permit such an inquiry here into the meaning of a union's constitution and bylaws.

draw from these agreements, as circumstances so require."

■■ Defendants, nonetheless, contend that the contract formed by the constitution and bylaws of the union was modified by the newsletter statement that "[u]nder IBEW rules, the final offer made by the company must be sent out for a vote." The union's promise not to order a strike without a second vote, in exchange for the members' initial authorization vote, might be viewed as a "bargained-for exchange of significant value" sufficient to support such a modification. (Compare *Terminal Freezers, Inc. v. Roberts Frozen Foods, Inc.* (1976), 41 Ill. App. 3d 981, 988-89, 354 N.E.2d 904, 910 (contract modification must generally be supported by consideration), with *Land of Lincoln Savings & Loan v. Michigan Avenue National Bank* (1982), 103 Ill. App. 3d 1095, 1103, 432 N.E.2d 378, 384 ("consideration" includes a change in position or legal relation given in exchange for a promise).) However, the offer in the union newsletter was a conditional one at best. It suggested that there would be a second strike vote after the company's final offer. If a condition precedent (*i.e.*, a condition that must be performed before the contract becomes binding) remains unsatisfied, the contractual obligations end. (*Lyntel Products, Inc. v. Alcan Aluminum Corp.* (1981), 107 Ill. App. 3d 176, 180-81, 437 N.E.2d 653, 657.) Arthur Perry stated in his affidavit that AT&T representatives refused to present the company's final offer before the strike deadline, and so he carried out the strike sanction.

■■ ■ Defendants now argue that "final offer" is not a term of art and that the "common and ordinary meaning" of "final offer" is "the last offer made by the company." Questions of interpretation of contract language are, of course, questions of law, not fact. (*Wil-Shore Motor Sales, Inc. v. Continental Illinois National Bank & Trust Co.* (1984), 130 Ill. App. 3d 167, 171, 474 N.E.2d 376, 379.) Although there were negotiations between the union and AT&T, defendants have not shown that the company made any offers upon which a vote could be taken. We must take statements in affidavits supporting summary judgment as true, unless the nonmoving party presents evidence to contradict them. (*Zannis v. Lake Shore Radiologists, Ltd.* (1982), 104 Ill. App. 3d 484, 487, 432 N.E.2d 1108, 1110; *Ohio Oil Co. v. Yacktman* (1976), 36 Ill. App. 3d 255, 261, 343 N.E.2d 544, 548-49.) Whether AT&T or Illinois Bell made any offers at all is simply not shown by the record, and therefore we have no means of weighing the plausibility of defendants' proposed construction of "final offer." In light of this, and Perry's uncontradicted statement that there was no final offer from the company—even if the newsletter might have modified the terms of the union constitution—no other conclusion is

possible under this record than that there was a failure of condition and that no further action was required to validate the strike.[2]

Moreover, defendants' contract-modification argument is premised on a misunderstanding of plaintiff's role in the international union. A tally sheet of the strike vote shows that local members voted on local and national issues. According to Cheeseman's affidavit, Local 165 and Illinois Bell were bound by the conduct of IBEW and AT&T. Article 17 of the IBEW constitution provides:

"Sec. 11. No [Local Union] shall allow its members to work for any employer in difficulty with any other [Local Union] of the I.B.E.W., providing the [International President] has recognized such difficulty."

Article 17 also states:

"Sec. 7. This Constitution and the rules herein shall be considered a part of all [Local Union] bylaws and shall be absolutely binding on each and every [Local Union] member.

Sec. 8. All [Local Union] bylaws or rules in conflict with this Constitution and the rules herein are null and void."

Thus, under the union constitution, Local 165 had no authority to refuse to strike if the rest of the IBEW went out against the AT&T system, and it could not promise that there would be no nationwide strike without a second vote. Words derive their meaning from the context in which they are used, and a contract must be interpreted as a whole, "by viewing each part in light of the others." (*Board of Trade v. Dow Jones & Co.* (1983), 98 Ill. 2d 109, 122, 456 N.E.2d 84, 90.) Plaintiff's newsletter offer, construed consistently with its power under the constitution, at best indicated that a second vote would be taken on Illinois Bell's final offer on local issues. Perry's affidavit indicates that the strike here included all IBEW members employed nationwide in the AT&T System. Local 165 was therefore bound by sec. 11 of article 17 of the IBEW constitution to honor it. Any modification of the contract formed by the union constitution and bylaws cannot be viewed in isolation, but rather must be construed in light of the whole contract. (See *In re Halas* (1984), 104 Ill. 2d 83, 92-93, 470

---

[2]It would be strange indeed for us to construe a statement connected with a strike-authorization vote in a way that would encourage an employer to take a position of intransigence, yet defendants' proposed interpretation of this statement would have allowed Bell to stop bargaining after the vote in order to make sanctions for violating the union's strike unenforceable in our courts. While promotion of orderly labor-management relations is primarily the province of the NLRB and the Federal courts, this court will not perform its duty to apply State law in a manner that discourages bargaining.

N.E.2d 960, 964-65.) Defendants' argument that a contract modification prevents plaintiffs from now collecting fines is simply untenable.

■■■ Defendants next argue that the union cannot enforce its fines because it breached its fiduciary obligation to its members by never telling them of their right to resign from the union during the strike. (See *Pattern Makers' League of North America* (1982), 265 N.L.R.B. 1332 (deciding that union rule prohibiting members from resigning during a strike, which was the basis for assessment against former members who crossed a picket line, was an unfair labor practice), *enforcement granted Pattern Makers' League of North American v. NLRB* (7th Cir. 1983), 724 F.2d 57, *aff'd* (1985), 473 U.S. 95, 87 L. Ed. 2d 68, 105 S. Ct. 3064; see also *NLRB v. Granite State Joint Board, Textile Workers* (1972), 409 U.S. 213, 34 L. Ed. 2d 422, 93 S. Ct. 385.) In support of their argument, defendants cite *International Union of Electrical, Radio & Machine Workers v. NLRB* (D.C. Cir. 1962) 307 F.2d 679, *cert. denied* (1962), 371 U.S. 936, 9 L. Ed. 2d 270, 83 S. Ct. 307, which involved enforcement of an NLRB unfair-labor-practice order, a matter clearly outside our own jurisdiction. In that case, an employee resigned from the union while there was no collective-bargaining agreement with the company. The company and union eventually signed an agreement that made union membership a condition of employment. The employee did not learn of this requirement within the payment deadline, but he mailed his fees and dues to the union the day after he was told about it. The union refused to accept the late payment and his application for union membership, and he was subsequently discharged from employment. In upholding the NLRB's finding that this violated the employee's rights, then Judge Burger of the District of Columbia Circuit noted that, under section 8(b)(2) of the NLRA, a union cannot lawfully demand an employee's discharge, under a union security agreement, if membership "has been denied *** on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required." (307 F.2d 679, 683.) The District of Columbia Circuit stated that a union has a fiduciary obligation to employees because of its comprehensive power and the degree of dependence employees must place on their union:

> "From the beginning of [an individual's] employment, the union which can require his membership or command his discharge is therefore charged with an obligation of fair dealing which includes the duty to inform the employee of his rights and obligations *so that the employee may take all necessary steps to protect his job."* (Emphasis added.) (*International Union of Electrical, Radio & Machine Workers v. NLRB* (D.C. Cir.

1962), 307 F.2d 679, 683.)

Defendants, in contrast to the employee in the above-cited case, were under no threat of losing their jobs. Rather, they continued working during the strike, and it was the other union members participating in the walkout who faced the threat of discharge. In addition, the local's trial-board decision was amended so that defendants did not even risk expulsion from the union. There is no indication that defendants were unable to consult with lawyers or anyone else to learn whether they had the right to resign from the union. If indeed it would be a defense to a contract action that we could consider, we find defendants' breach-of-fiduciary-obligation argument to be without merit.

■■ Defendants next argue that they were never given copies of the constitution and cannot now be forced to pay the assessment levied against them because they were unaware that the union had the authority to impose fines. Plaintiff filed an affidavit from John Cheeseman, a member of its executive board, which indicates that copies of the constitution and bylaws were readily available at the union hall and at each jobsite. Ignorance of the precise terms of a contract is no defense to a breach of contract action if not the fault of the party seeking to enforce the contract. (*Harney-Morgan Chevrolet Olds Co. v. Rabin* (1983), 118 Ill. App. 3d 602, 606, 455 N.E.2d 130, 134.) To the extent that there must be a "meeting of the minds," we believe that anyone joining a union must reasonably expect that the union would impose sanctions for failure to participate in concerted activity. "Integral to this federal labor policy [of allowing workers to pool their economic strength] has been the power of the chosen union to protect against erosion of its status under that policy through reasonable discipline of members who violate rules and regulations governing membership." (*NLRB v. Allis-Chalmers Manufacturing Co.* (1967), 388 U.S. 175, 181, 18 L. Ed. 2d 1123, 1128, 87 S. Ct. 2001, 2007.) Consequently, we deny defendants' request for reversal based on the claim that they did not have copies of the constitution or bylaws or knowledge of the terms.

Defendants also argue that there is a "factual question" whether the fines were reasonable. In *NLRB v. Boeing Co.* (1973), 412 U.S. 67, 75-78, 36 L. Ed. 2d 752, 758-60, 93 S. Ct. 1952, 1957-59, the court affirmed the NLRB's decision to decline jurisdiction to review the reasonableness of union fines. The Court stated:

> "Our review of state court cases *** reveals that state courts *applying state law* are quite willing to determine whether disciplinary fines are reasonable in amount. Indeed, the expertise required for a determination of reasonableness may well be

more evident in a judicial forum that is called upon to assess reasonableness in varying factual contexts than it is in a specialized agency. In assessing the reasonableness of disciplinary fines, for example, state courts are often able to draw on their experience in areas of the law apart from labor relations." (Emphasis added.) 412 U.S. 67, 76-77, 36 L. Ed. 2d 752, 759-60, 93 S. Ct. 1952, 1958.

■■■ The wage rates of all union members, including defendants, were a matter of record within the local. It is undisputed that the amount of the assessment equaled the gross wages earned by defendants during the strike, plus $25 in administrative costs. Defendants did not argue in the trial court how this method of calculating the assessment was unreasonable. Issues not raised in the trial court are waived on appeal. (*Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 500, 475 N.E.2d 872, 879; *Smith v. Ashley* (1975), 29 Ill. App. 3d 932, 934, 332 N.E.2d 32, 33.) Moreover, in their arguments on appeal, defendants have failed to give any basis for us to find unreasonableness, had the issue been preserved for review. Plaintiff counters:

"The fairness of the amount of these fines becomes apparent when it is remembered that defendants received all the economic benefits which were gained in the new collective bargaining agreement with Illinois Bell as a result of the strike, and that these benefits were made possible only by the economic sacrifice of the other members of the Local 165 who did not cross the picket line during the strike. The fine imposed against each defendant here did no more than place each defendant in the same economic position as the other members of Local 165 who honored the picket line during the strike."

■■■ Defendants next argue that there was insufficient evidence to find them guilty of the violations found by the union's trial board. In other words, because plaintiff brought this contract suit to collect fines that defendants promised to pay when they joined the union and became parties to the bylaws and constitution, plaintiff has the burden of proof. (See *Bank of Marion v. Robert "Chick" Fritz, Inc.* (1972), 9 Ill. App. 3d 102, 108, 291 N.E.2d 836, 840, *aff'd* (1974), 57 Ill. 2d 120, 311 N.E.2d 138.) Defendants contend, in essence, that summary judgment was premature because plaintiff has not yet produced sufficient evidence in the circuit court to establish its entitlement to payment under the contract. We disagree.

Some courts in other States, hearing union suits to collect fines, have been reluctant to consider whether the amount sought was in

fact due under the union constitution and bylaws. These courts defer entirely to the finding by the union's trial board of a violation of union rules. (See *Communications Workers of America, Local 5701 v. Drake* (Ind. Ct. App. 1985) 122 L.R.R.M. (BNA) 2072, 2075-76; *Local 4453, USA, AFL-CIO v. Wilson* (1979), 88 Wis. 2d 699, 277 N.W.2d 809. But see *North Jersey Newspaper Guild Local No. 173 v. Rakos* (1969), 110 N.J. Super. 77, 264 A.2d 453.) On the other hand, the Illinois Supreme Court has recognized our courts' power to consider the basic fairness of disciplinary actions by voluntary unincorporated associations (see *Van Daele v. Vinci* (1972), 51 Ill. 2d 389, 394-95, 282 N.E.2d 728, 732, *cert. denied* (1972), 409 U.S. 1007, 34 L. Ed. 2d 300, 93 S. Ct. 438), and section 103 of the Labor Management Reporting & Disclosure Act of 1959 (73 Stat. 519, 523 (1959)) provides:

> "Nothing contained in this subchapter [29 U.S.C.A. secs. 411 through 415 (West 1985)] shall limit the rights and remedies of any member of a labor organization under any State or Federal law or before any court or other tribunal, or under the constitution and bylaws of any labor organization." 29 U.S.C.A. sec. 413 (West 1985).[3]

■■ We need not decide the extent of court review, under Illinois law, of the adequacy of proof before a union trial board pursuant to the reasonableness inquiry recognized in *NLRB v. Allis-Chalmers Manufacturing Co.* (1967), 388 U.S. 175, 18 L. Ed. 2d 1123, 87 S. Ct. 2001. Defendants themselves filed records of the trial-board proceedings. One record indicates that union member Dewey Viars stated that Bradley showed up for work and crossed the picket line on Monday, Tuesday, Wednesday, and Friday of the first week, all of the following week and the first few days of the third week of the strike. This covers the entire period of the strike, except for Thursday, August 11, 1983. However, John Cheeseman indicated that he saw Bradley cross the picket line August 8 through August 12. As to Stankoskey, James Leamy's written charge that he "crossed the picket line and worked throughout the strike" was read into the record, and Leamy stated that he had nothing to add. This covers the entire period for which Stankoskey was fined. In their affidavits in the circuit court, defendants did not deny that they worked every day during the strike. Thus, the record shows that plaintiff was entitled to

---

[3]Federal preemption under the NLRA cannot be waived as a defense (see *International Longshoremen's Association v. Davis* (1986), 476 U.S. ____, 90 L. Ed. 2d 389, 106 S. Ct. 1904), but, as noted above, the reasonableness of a fine is not arguably within the unfair labor practice jurisdiction of the NLRB. See *NLRB v. Allis-Chalmers Manufacturing Co.* (1967), 388 U.S. 175, 18 L. Ed. 2d 1123, 87 S. Ct. 2001.

judgment as a matter of law, under even the most stringent standards of proof, on the claim that defendants worked throughout the strike.

 Defendants next argue that there is a material issue of fact as to whether Local 165's trial-board procedures constituted a fair hearing under the Labor Management Reporting and Disclosure Act. Section 101 of the Act provides:

"No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." (29 U.S.C.A. Sec. 411(a)(5) (West 1985).)

Statutes in existence at the time a contract is entered are considered as much a part of the contract as if they were expressly incorporated, and the contracting parties are deemed to accept these laws as part of the agreement. (*S & D Service, Inc. v. 915-925 W. Schubert Condominium Association* (1985), 132 Ill. App. 3d 1019, 1023, 478 N.E.2d 478, 483.) Section 102 of the Labor-Management Reporting and Disclosure Act (29 U.S.C.A. sec. 412 (West 1985)), provides that suit may be brought in Federal district court by any person whose rights under section 101 of the Act (29 U.S.C.A. sec. 411 (West 1985)), have been violated. We need not address whether section 102 provides for exclusive Federal jurisdiction (see *Crocco v. Local 333, United Marine Division, International Longshoremen's Association* (N.D. N.Y. 1985), 612 F. Supp. 1072; *Thorp v. Serraglio* (N.D. Ohio 1978), 464 F. Supp. 149), because this is not an action by a union member to enforce his or her section 101 rights: rather, it is a suit brought by a union to collect fines for breach of its constitution and bylaws. This court has an obligation to construe contracts, if possible, so that they do not violate Federal law, even Federal laws for which there is exclusive Federal jurisdiction. See *First Federal Savings & Loan Association v. Royal Faubion* (1985), 131 Ill. App. 3d 368, 369-70, 475 N.E.2d 989, 991; *Vendo Co. v. Stoner* (1969), 105 Ill. App. 2d 261, 295-97, 245 N.E.2d 263, 280-81 (Illinois courts have jurisdiction to hear and adjudicate Federal antitrust defenses to contract actions). Nonetheless, section 101 of the Labor-Management Reporting & Disclosure Act is not authority for broad-ranging judicial review of union actions, and the requirements of this section are satisfied if there is *some* evidence to support the charges. (*International Brotherhood of Boilermakers v. Hardeman* (1971), 401 U.S. 233, 246-47, 28 L. Ed. 2d

10, 21-22, 91 S. Ct. 609, 617-18; *Gustafson v. American Train Dispatchers' Association, AFL-CIO* (7th Cir. 1986), 788 F.2d 1284, 1287; *Vars v. International Brotherhood of Boilermakers* (2d Cir. 1963), 320 F.2d 576, 578.) This requirement was clearly satisfied for every day for which a fine was levied.

In addition, it has been held that a disciplinary sanction may be void under section 101 of the Labor-Management Reporting & Disclosure Act if based upon facts and allegations not within the scope of the written charges on which the hearing was to have been held. (*Eisman v. Baltimore Regional Joint Board of Amalgamated Clothing Workers of America* (4th Cir. 1974), 496 F.2d 1313, 1314.) Similarly, it has been held, as a matter of Illinois law, that to enforce a disciplinary fine in State court, a union must furnish the disciplined member with advance notice of the charges and the union trial date. (*International Brotherhood of Electrical Workers, Local No. 399 v. Zoll* (1985), 135 Ill. App. 3d 910, 482 N.E.2d 446.) The record shows that notice was sent to Bradley a week before he was to appear before the union trial board and notice was delivered to Stankoskey 10 days before he was to appear. Both notices contained copies of the complaint filed against defendants by John Cheeseman charging them with violating article 17, section 1(17), by crossing a picket line August 8 through August 23. For example, Cheeseman's written complaint, which was mailed to Bradley, asserts that "Brother Bradley crossed the I.B.E.W. picket line at approximately 8 AM on 8/8/83, and worked throughout the strike." Thus, Bradley was put on notice that he would have to face charges that he worked every day of the strike. Stankoskey received a similar notice. Both notices also provided:

> "You may bring witnesses to give evidence in your behalf. You will be afforded the opportunity at the hearing to present any relevant evidence and to cross-examine any witnesses you may desire. You may, if you desire have an *IBEW member* act as your counsel." (Emphasis in the original.)

As previously noted, defendants failed to attend their hearings.

Finally, defendants argue that the union lacks capacity to sue them. Lack of capacity to sue must be raised in the trial court, and cannot be raised for the first time on appeal. (*Franklin Union No. 4 v. People* (1906), 220 Ill. 354, 364-65, 77 N.E. 176, 179; *Zimmerman Ford, Inc. v. Cheney* (1971), 132 Ill. App. 2d 871, 874, 271 N.E.2d 682, 684; *Wiegel v. One La Salle Co.* (1966), 75 Ill. App. 2d 272, 277, 221 N.E.2d 117, 119.) Defendants did not assert plaintiff's lack of capacity in the circuit court, but sought to amend the pleadings in the appellate court pursuant to Supreme Court Rule 362 (87

Ill. 2d R. 362) to raise this defense. The purpose of Rule 362 is to amend the pleadings so that they reflect the evidence presented to the trial court since Illinois is a fact pleading State that requires the evidence to conform to the pleadings. Rule 362 is not a vehicle to raise wholly new issues on appeal. (See *Melvin v. City of West Frankfort* (1981), 93 Ill. App. 3d 425, 433-34, 417 N.E.2d 260, 265-66.) After defendant's brief was filed, this court vacated its earlier order allowing amendment of the pleadings on appeal (No. 85—2225). We conclude that this defense is waived.

Even were we to reach the merits, defendants' assertion of plaintiff's lack of capacity is wholly frivolous. Defendants acknowledge that section 2—209.1 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—209.1), grants a voluntary unincorporated association the right to sue and be sued in its own name in all actions. This section was added by Public Act 82-280, and was effective January 1, 1984. While there is conflicting authority over whether this statute should be given retroactive application to suits pending as of its effective date (compare *Brucato v. Edgar* (1984), 128 Ill. App. 3d 260, 470 N.E.2d 615, with *Rivard v. Chicago Firefighters Union No. 2* (1986), 145 Ill. App. 3d 207, 494 N.E.2d 756), the complaint against Bradley was filed on June 4, 1984, and the complaint against Stankoskey was filed on September 4, 1984, both after the effective date of the statute.

Lack of capacity as a defense in this case refers only to the capacity to sue and be sued as an association. Earlier practice required all members of an unincorporated association to be named as plaintiffs or defendants in a suit. (See *Payne v. Collier* (1976), 38 Ill. App. 3d 201, 347 N.E.2d 863.) This defense is distinct from incapacity to contract, which is a defense to breach of contract action against minors and other incompetents. (See *Terrace Co. v. Calhoun* (1976), 37 Ill. App. 3d 757, 761-62, 347 N.E.2d 315, 319.) At the very least, the contract formed by a union constitution and bylaws can be created by the assent of its members, and there is no limit on the number of signatories to a contract. As previously noted, union constitutions and bylaws have long been recognized under Illinois law as valid contracts, binding on members. (*Illinois Education Association v. Illinois Federation of Teachers* (1982), 107 Ill. App. 3d 686, 689, 437 N.E.2d 1265, 1267; *Napier v. Firemen's Association* (1973), 9 Ill. App. 3d 975, 978, 293 N.E.2d 384, 386; *Webster v. Midland Electric Coal Corp.* (1963), 43 Ill. App. 2d 359, 369, 193 N.E.2d 212, 217, *cert. denied* (1964), 377 U.S. 964, 12 L. Ed. 2d 735, 84 S. Ct. 1645.) We find any defense in this case based on the union's lack of capacity to sue to be wholly

214

without merit.

The judgments of the circuit court against defendants are affirmed.

Affirmed.

BILANDIC, P.J., and HARTMAN, J., concur.